### CELESTINA GREEN *v.* GENERAL DYNAMICS CORPORATION, ELECTRIC BOAT DIVISION, ET AL.
### (SC 15649)

Callahan, C. J., and Borden, Berdon, Norcott and McDonald, Js.

---

Argued October 30, 1997—officially released June 9, 1998

*Amy M. Stone*, for the appellant (claimant).

*Lucas D. Strunk*, for the appellees (named respondent et al.).

*Robert F. Carter* and *Joram Hirsch* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Opinion*

MCDONALD, J. The issue in this case is whether the dependent widow of a former employee with a long latent occupational disease contracted from conditions

of the workplace who is retired and unemployed at the time of his incapacitation and death from the disease is entitled to dependent's weekly death benefits.

The facts are not in dispute. Ernest Green (employee) was a full-time employee of the named respondent, the Electric Boat Division of General Dynamics Corporation (Electric Boat), from 1949 until he retired in June, 1978. During the course of his employment and arising out of it, the employee was exposed to asbestos and contracted malignant mesothelioma, a form of cancer. The employee, however, had no symptoms, was capable of working and did so until he retired from Electric Boat at the age of fifty-four. He was thereafter employed from 1981 to 1985 at the Norwich Convalescent Home.

In July, 1989, the employee was first diagnosed with cancer, from which he died the following December. His wife, Celestina Green (claimant), filed a claim for dependent's workers' compensation death benefits from Electric Boat.[1] Electric Boat contested the claim and a hearing was held by the workers' compensation commissioner for the second district (commissioner). At that hearing, the claimant presented evidence of the employee's average weekly wages at Electric Boat for the twenty-six weeks preceding his retirement. In 1993, the commissioner awarded the claimant dependent's death benefits at a weekly rate based on the employee's last wages at Electric Boat, subject to the statutory maximum compensation rate in force at the time of his incapacity. Electric Boat appealed from the award to the compensation review board (review board).

The review board affirmed the award. It found that the commissioner properly had awarded dependent's

[1] The original respondents included Electric Boat, CIGNA Property and Casualty Company, Aetna Casualty and Surety Company, Liberty Mutual Insurance Company, National Employers Company and the Second Injury and Compensation Assurance Fund. The respondents on appeal to this

death benefits to the claimant and properly had determined the weekly compensation rate to be paid to the claimant. The review board based its decision on its interpretation of General Statutes (Rev. to 1989) § 31-306,[2] and a retroactive application of General Statutes (Rev. to 1991) § 31-310c.[3]

court are Electric Boat, CIGNA Property and Casualty Company and Aetna Casualty and Surety Company.

[2] General Statutes (Rev. to 1989) § 31-306 (b) provided in relevant part: "Compensation shall be paid on account of death resulting from an accident arising out of and in the course of employment or from an occupational disease as follows . . . .

"(2) To those wholly dependent upon the deceased employee at the time of his injury, a weekly compensation equal to sixty-six and two-thirds per cent of the average weekly earnings of the deceased at the time of injury but in no case more than the maximum weekly benefit rate set forth in section 31-309 for the year in which the injury occurred or less than twenty dollars weekly. In the case of an occupational disease, the time of injury shall be the date of total or partial incapacity to work as a result of such disease. . . ."

The review board also based its decision in part on its opinions in *Orcutt* v. *Ohmweave Co.*, 8 Conn. Workers' Comp. Rev. Op. 125 (1990), and *Deremer* v. *General Dynamics Corp.*, 11 Conn. Workers' Comp. Rev. Op. 317 (1993).

[3] General Statutes (Rev. to 1991) § 31-310c provided in relevant part: "[I]n the case of an occupational disease the average weekly wage shall be calculated as of the date of total or partial incapacity to work. However, in the case of an occupational disease which manifests itself at a time when the worker has not worked during the twenty-six weeks immediately preceding the diagnosis of such disease, the claimant's average weekly wage shall be considered to be equivalent to the greater of (1) the average weekly wage determined pursuant to section 31-310 and adjusted pursuant to section 31-307a [cost of living increase] or (2) the average weekly wage earned by the claimant during the twenty-six calendar weeks last worked by the claimant, which wage shall be determined in accordance with said section 31-310 and adjusted pursuant to said section 31-307a." Section 31-310c was enacted as Public Acts 1990, No. 90-116, § 8, which became effective October 1, 1990, after the employee's incapacitation and subsequent death.

General Statutes (Rev. to 1989) § 31-310 provided in relevant part: "Determination of average weekly wage of injured worker. . . . [T]he average weekly wage shall be ascertained by dividing the total wages received by the injured worker from the employer in whose service he is injured during the twenty-six calendar weeks immediately preceding that during which he was injured, by the number of calendar weeks during which . . . such worker was actually employed by such employer . . . . When the employment previous to injury as provided above is computed to be less than a

Electric Boat appealed from that decision to the Appellate Court, which, in a closely divided opinion, reversed the review board's decision and denied the claim for weekly benefits. *Green* v. *General Dynamics Corp.*, 44 Conn. App. 112, 120, 687 A.2d 550 (1996). The Appellate Court held that the claimant is not entitled to weekly benefits because the employee had no wages during the twenty-six weeks preceding the manifestation of the disease; id., 119; the "time of injury" in occupational diseases. General Statutes (Rev. to 1989) § 31-306 (b) (2). We granted the claimant's petition for certification[4] and now reverse the judgment of the Appellate Court.

Electric Boat concedes that the employee's injuries, from mesothelioma due to asbestos exposure, arose out of and in the course of his employment with Electric Boat. It is undisputed that mesothelioma was the cause of his death. Electric Boat also does not contest the award of funeral expenses to the claimant. Rather, it claims that, under § 31-306, the weekly benefits to a dependent spouse are nothing because the employee had no weekly wages, at "the time of injury," upon which to base a calculation of benefits. Our workers' compensation law refutes that argument.

We begin by examining the purpose of the Workers' Compensation Act (act). In interpreting the act, we

---

net period of two calendar weeks, his weekly wage shall be considered to be equivalent to the average weekly wage prevailing in the same or similar employment in the same locality at the time of injury . . . ."

[4] We granted the claimant's petition for certification limited to the following issues: (1) "Is the surviving dependent spouse of an employee who died as a result of an occupational disease entitled to benefits under General Statutes § 31-306 when: (a) the decedent did not work for the twenty-six weeks preceding the date of the manifestation of the occupational disease; and (b) the occupational disease manifested itself prior to October 1, 1990, the effective date of Public Acts 1990, No. 90-116?" and (2) "If the answer to the first question is yes, how should the average weekly wage used to determine the amount of the benefits to the surviving dependent spouse be

must "ascertain the intent of the legislature and . . . construe the statute in a manner that effectuates that intent." (Internal quotation marks omitted.) *Starr* v. *Commissioner of Environmental Protection*, 236 Conn. 722, 737, 675 A.2d 430 (1996). We have found previously that the act "is to be broadly construed to effectuate the purpose of providing compensation for an injury arising out of and in the course of the employment . . . . The purposes of the act itself are best served by allowing the remedial legislation a reasonable sphere of operation considering those purposes." (Citations omitted; internal quotation marks omitted.) *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 97, 491 A.2d 368 (1985). Furthermore, as a general rule of statutory construction, we must construe the act in its entirety, to "produce a harmonious whole," rather than looking at each part separately and in isolation. *State* v. *Spears*, 234 Conn. 78, 91, 662 A.2d 80, cert. denied, 516 U.S. 1009, 116 S. Ct. 565, 133 L. Ed. 2d 490 (1995).

The act provides the sole remedy for employees and their dependents for work-related injuries and death. General Statutes § 31-284.[5] We have observed that "both the employer and the employee have relinquished certain rights to obtain other advantages. The employee no longer has to prove negligence on the part of the employer, but, in return, he has to accept a limited, although certain, recovery. . . . The employer, in turn,

calculated under the facts of this case?" *Green* v. *General Dynamics Corp.*, 240 Conn. 916, 692 A.2d 814 (1997).

[5] General Statutes § 31-284 (a) provides in relevant part: "An employer . . . shall not be liable for any action for damages on account of personal injury sustained by an employee arising out of and in the course of his employment or on account of death resulting from personal injury so sustained, but an employer shall secure compensation for his employees . . . . All rights and claims between an employer . . . and employees, or any representatives or dependents of such employees, arising out of personal injury or death sustained in the course of employment are abolished other than rights and claims given by this chapter . . . ."

guarantees compensation to an injured employee in return for the exclusivity of the workers' compensation liability to its employees." (Citation omitted.) *Bouley* v. *Norwich*, 222 Conn. 744, 752, 610 A.2d 1245 (1992). Workers' compensation guarantees weekly benefits for a permanent loss of earning capacity, based on the employee's average weekly wage, to an employee and the employee's dependents for injuries suffered in the course of employment. *Cappellino* v. *Cheshire*, 226 Conn. 569, 575, 628 A.2d 595 (1993); *Ancona* v. *Norwalk*, 217 Conn. 50, 56, 584 A.2d 454 (1991).

As Arthur Larson points out: "The normal unit by which benefits are measured consists of a fixed statutory percentage . . . of average weekly wage. . . . [T]he entire objective is to arrive at as fair an estimate as possible of [a] claimant's future earning capacity . . . ." (Internal quotation marks omitted.) 5 A. Larson & E. Larson, Workers' Compensation Law (1997) § 60.00, p. 10-604. In the case of permanent disability, it is the loss of earning capacity rather than the actual wage loss that is considered. *Howell* v. *Supermarkets General Corp.*, 340 A.2d 833, 836 (Del. 1975).

In this case, the employee's capacity to earn income was permanently destroyed by his long latent occupational disease. His disease, mesothelioma, contracted at Electric Boat, has an extensively long latency period, between twenty-five and forty years. See *Nevada Industrial Ins. System* v. *Jesch*, 101 Nev. 690, 692, 709 P.2d 172 (1985). Such long latency occupational diseases do present unique workers' compensation problems, as we have here. *State ex rel. Liposchak* v. *Industrial Commission*, 73 Ohio St. 3d 194, 196, 652 N.E.2d 753, reconsideration denied, 655 N.E.2d 188 (1995). As the Pennsylvania Supreme Court observed: "Occupational diseases are, from a legal standpoint, peculiar in this— that they arise, not from an accident or event happening at a precise moment, but from a day by day exposure

to unhealthful conditions over an extended period; the exact time of their origin is necessarily obscure and their insidious progress is not revealed until, frequently after a long interval, the disability which they create manifests itself." *McIntyre* v. *E. J. Lavino & Co.*, 344 Pa. 163, 165–66, 25 A.2d 163 (1942).

When the original act was passed in 1913, it awarded benefits only to those injured in industrial accidents and not to those incapacitated as a result of an occupational disease. Public Acts 1913, c. 138; *Miller* v. *American Steel & Wire Co.*, 90 Conn. 349, 97 A. 345 (1916). In 1927, the General Assembly amended the act's definition of injury to include occupational diseases.[6] Public Acts 1927, c. 307, § 7. In the case of an occupational disease, the General Assembly provided that the date of injury was to be determined by the date of incapacity to work. That definition appeared in General Statutes (Rev. to 1989) § 31-306 (b) (2) concerning death benefits; see footnote 2; which was in effect at the time of the claimant's application for benefits.

In *Rousu* v. *Collins Co.*, 114 Conn. 24, 31, 157 A. 264 (1931), and later in *Michna* v. *Collins Co.*, 116 Conn. 193, 199–200, 164 A. 502 (1933), cases concerning long latent occupational diseases, this court held that in the case of an employee working at the time of his incapacitation, the wages at the time of the incapacitation and not those at the time of the employment during which the disease was contracted should be used to calculate the loss of earning power.

In *Mulligan* v. *F. S. Electric*, 231 Conn. 529, 540, 651 A.2d 254 (1994), this court also held that if an employee is working at the time of incapacitation from an occupational disease, wages at that time should be used to

---

[6] General Statutes (1930 Rev.) § 5223 defined an occupational disease as one "peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such."

compute the average weekly wages for the calculation of weekly benefits. Although an injury and resulting incapacity are substantially coincident in most instances, in *Mulligan* there was considerable time intervening between the actual injury and the incapacity. Id., 533. The court in *Mulligan* held that the loss should be measured by the earnings at the time the loss occurs, rather than the earnings at the time of the actual injury. Id., 541. We there reasoned that the wages at the time of the injury may be so remote that changing conditions render them incapable of reflecting the present value of the lost earning power. Id. That reasoning does not require the denial of weekly benefits here. Rather, workers' compensation law has followed this rationale and did provide a method to calculate lost earning power for a former employee with a long latent occupational disease who is retired and unemployed when the disease manifests itself and incapacitates the former employee.[7]

In April, 1990, the legislature enacted Public Acts 1990, No. 90-116, § 8 (P.A. 90-116, § 8), thereafter codified as General Statutes (Rev. to 1991) § 31-310c. This legislation, effective October 1, 1990, addressed circumstances identical to those in this case. Section 31-310c provided: "[I]n the case of an occupational disease which manifests itself at a time when the worker has not worked during the twenty-six weeks immediately preceding the diagnosis of such disease, the claimant's average weekly wage shall be considered to be equivalent to the greater of (1) *the average weekly wage determined pursuant to section 31-310 . . .* or (2) the average weekly wage earned by the claimant during the

---

[7] Electric Boat does not argue that retirement disqualifies any former employee from receiving weekly benefits for a permanent loss of the capacity to earn income. As the history of the employee in this case illustrates, a person retired from one employment still may have and often does exercise a capacity to earn wages.

twenty-six calendar weeks last worked by the claimant . . . ." (Emphasis added.)

Subdivision (1) of § 31-310c would be meaningless if General Statutes (Rev. to 1989) § 31-310 did not provide a manner for calculating benefits in the case of an employee who was not working when the disease manifested itself. We hold that § 31-310 did provide a method for calculating the average weekly wage of an individual who was unemployed at that time. Section 31-310 provided in relevant part: "When the employment previous to injury . . . is computed to be less than a net period of two calendar weeks, [an employee's] weekly wage shall be considered to be equivalent to the average weekly wage prevailing in the same or similar employment in the same locality at the time of injury . . . ." When an employee is retired and unemployed at that time, the "employment previous to injury" is necessarily less than two weeks and the contemporaneous prevailing weekly wage is considered the employee's weekly wage.

If Electric Boat was correct in arguing that under § 31-310 a worker who is diagnosed with an occupational disease while unemployed does not have an average weekly wage, then the enactment of § 31-310c (1) would have no effect. The average weekly wage under § 31-310 for unemployed workers would always be zero. We cannot assume that the legislature enacted a meaningless statute. *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 303, 695 A.2d 1051 (1997) ("[w]e presume that the legislature had a purpose for each sentence, clause or phrase in a legislative enactment, and that it did not intend to enact meaningless provisions"). The legislature clearly intended that the first alternative set forth in § 31-310c (1), weekly wages under § 31-310, be a method that produces some result.

The legislative history confirms this interpretation. Representative Joseph Adamo introduced the bill for

P.A. 90-116 and explained: "[T]he new section related to the computation of the compensation rate for a person regarding an occupational disease who has not worked, we insert new language to provide that it can be done in one of two ways. One, that we go back to the person's last date of work and compute his average weekly wage under [§ 31-310] and enhance it with the cost of living increase . . . and/or *we compare him to a worker doing comparable work at the present time* and provide the benefit would be that which is greater." (Emphasis added.) 33 H.R. Proc., Pt. 7, 1990 Sess., pp. 2282–83. The first method that Representative Adamo referred to, "that we go back to the person's last date of work," was codified in 1991 as § 31-310c (2) as follows in part: "the average weekly wage earned by the claimant during the twenty-six calendar weeks last worked by the claimant . . . ." See Public Acts 1990, No. 90-116, § 8 (2). The other method, where "we compare [an employee] to a worker doing comparable work at the present time," was codified in 1991 as § 31-310c (1), which provided in part: "the average weekly wage determined pursuant to section 31-310 . . . ." See Public Acts 1990, No. 90-116, § 8 (1). It is clear that § 31-310, in the eyes of the legislature, did provide, prior to the enactment of § 31-310c, a method for calculating benefits for unemployed workers with occupational diseases based on the prevailing weekly wage for similar work at the time of the injury.

At the time of the enactment of § 31-310c there was controversy as to the method of calculating the average weekly wages in these circumstances. In *Orcutt* v. *Ohmweave Co.*, 8 Conn. Workers' Comp. Rev. Op. 125 (1990), the review board was called upon to review a commissioner's 1989 award of disability benefits reissued by that commissioner in February, 1990. The commissioner had used the prevailing weekly wage at the time of the manifestation of the disease in awarding weekly

benefits to a retired employee who at the time was not employed within twenty-six weeks of the diagnosis of her asbestosis, a long latent occupational disease. Id., 127. The commissioner relied on the § 31-310 proviso that where an employee had less than two weeks of employment during that period, prevailing weekly wages for similar employment were to be considered as the average weekly wage in the calculation of benefits. Id., 128; see *Johnson* v. *Phaefflin*, 136 Conn. 107, 110, 68 A.2d 687 (1949). After the commissioner's decision and while the employer's appeal was pending before the review board, the legislature enacted P.A. 90-116, § 8.

The review board in *Orcutt* issued its decision after P.A. 90-116, § 8, was enacted, but prior to its effective date. The review board ruled that because P.A. 90-116 was not yet in effect, the commissioner could not use prevailing weekly wages at the time the disease manifested itself, as P.A. 90-116, § 8 (1) would allow. The review board thereupon modified the award of benefits to base it on the last wages earned by the employee before her retirement from the employer, as P.A. 90-116, § 8 (2) would provide. Although the review board commended the commissioner "for his powers of prophecy" with respect to P.A. 90-116, § 8 (1); *Orcutt* v. *Ohmweave Co.*, supra, 8 Conn. Workers' Comp. Rev. Op. 128; it failed to recognize that his prophecy was self-fulfilling in the subsequent legislation.

The review board's decision in *Orcutt*, although contrary to the commissioner's method of calculation, confirmed that the existing law, under the review board's interpretation, allowed for the use of the last weekly wages earned by the employee. In this the review board opinion supports the inference that P.A. 90-116, § 8 (2) codified the existing law. See *Deremer* v. *General Dynamics Corp.*, 11 Conn. Workers' Comp. Rev. Op. 317 (1993).

In enacting P.A. 90-116, § 8, the legislature codified both methods of calculation and provided that the average weekly wage should be whichever is determined to be the greater. "[I]f the amendment was enacted soon after controversies arose as to the interpretation of the original act, it is logical to regard the amendment as a legislative interpretation of the original act . . . ." (Internal quotation marks omitted.) *State* v. *Blasko*, 202 Conn. 541, 558, 522 A.2d 753 (1987).

The legislative history shows overall the legislation was intended to clarify the existing law. Representative Adamo stated that the bill "will probably most likely retain the status quo." 33 H.R. Proc., supra, p. 2305. Accordingly, we conclude that in order to give effect to § 31-310c, it must be construed as clarifying § 31-310.

Because § 31-310c clarifies § 31-310, it is to be applied retroactively. It is "[t]he general rule . . . that when a legislative act is intended to clarify existing law it necessarily has retroactive effect." (Internal quotation marks omitted.) *Reid* v. *Zoning Board of Appeals*, 235 Conn. 850, 859 n.5, 670 A.2d 1271 (1996); *State* v. *Magnano*, 204 Conn. 259, 284, 528 A.2d 760 (1987).

Although the decision in *Orcutt* did not precede passage of P.A. 90-116, § 8, § 31-310 had provided for a calculation based on prevailing wages long before the enactment of the public act. "[A]bsent a contrary legislative directive, it is presumed that if any part of an act applies retroactively, all of it is retroactive. . . ." (Citations omitted; internal quotation marks omitted.) *Reid* v. *Zoning Board of Appeals*, supra, 235 Conn. 864. Therefore, we conclude that the provisions of § 31-310c applying the greater sum of calculations based on the prevailing wage when the occupational disease is diagnosed or the wage resulting from use of the last twenty-six weeks of employment would apply in the case of an occupational disease diagnosed in 1989.

The claimant sought weekly death benefits based on the average weekly earnings of the employee under § 31-306 (b) (2). Since § 31-310 provided the method of calculation of average weekly wages "[f]or the purposes of" the act, the provisions of § 31-310c apply to the claimant's application for dependent's death benefits. We conclude that the employee's complete retirement under the circumstances, at the time of his incapacity, does not bar weekly death benefits for a permanent loss of earning capacity. This is in keeping with the purpose of our act.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to remand the case to the review board with direction that it be remanded to the commissioner to calculate the claimant's weekly benefits in accordance with § 31-310c.

In this opinion CALLAHAN, C. J., and BERDON and NORCOTT, Js., concurred.

BORDEN, J., dissenting. I agree with the majority that the plaintiff dependent widow in this case is entitled to benefits. I disagree, however, that those benefits are to be measured by General Statutes § 31-310c. I would conclude that: (1) § 31-310c is not retroactive; (2) the Appellate Court was incorrect in deciding that because the calculation of the decedent's average weekly wage amounted to zero under General Statutes (Rev. to 1989) § 31-310, there were no dependent death benefits payable under General Statutes (Rev. to 1989) § 31-306 (b) (2); and (3) the applicable statute for the calculation of dependent death benefits is General Statutes (Rev. to 1989) § 31-310, namely, "the average weekly wage prevailing in the same or similar employment in the same locality *at the time of injury* . . . ." (Emphasis added.) This means that because the decedent became

incapacitated in July, 1989, which is the date of injury for an occupational disease, his dependents are entitled to benefits calculated on that basis.

I do not believe that § 31-310c was intended by the legislature to be retroactive. First, that section sets up a *two part* calculation, and provides that the *greater* of the two calculations will be the applicable calculation. Nowhere in prior practice or law has this kind of two part calculation been recognized.

Second, our statutes provide a presumption that legislation is prospective; General Statutes § 55-3;[1] and we have generally required a strong showing of legislative intent to overcome that presumption. See *Rice* v. *Vermilyn Brown, Inc.*, 232 Conn. 780, 786, 657 A.2d 616 (1995) (" '[W]e have uniformly interpreted § 55-3 as a rule of presumed legislative intent that statutes affecting substantive rights shall apply prospectively only. . . . The Legislature only rebuts this presumption when it clearly and unequivocally expresses its intent that the legislation shall apply retrospectively.' "). As I explain in more detail later in this opinion, there is no such showing here. I do not think that legislation addressing a particular question can be deemed retroactive simply because a problem of interpretation has arisen. If that were all it took, the exception would swallow the statutory rule.

Third, the available legislative history is insufficient to draw the inference of retroactivity. The principal support offered by the majority for such an inference is the statement of Representative Joseph A. Adamo to the effect that the legislation would maintain the "status quo." 33 H.R. Proc., Pt. 7, 1990 Sess., p. 2305. That

---

[1] General Statutes § 55-3 provides: "Limitation of effect of certain acts. No provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have a retrospective effect."

statement, however, was in response to a question asking what the fiscal effect of the legislation would be—whether the amount of the benefits under the legislation would be more or less than under prior law.[2] The statement by Representative Adamo was not in response to a question asking whether the legislation was intended to clarify the meaning of the preexisting legislation. Indeed, during the same exchange, Representative Francis X. O'Neill described the bill as establishing "a new method for calculating the average weekly wage of a claimant" with an occupational disease. Id.

The only evidence in the legislative history suggesting possible retroactivity is a statement at the public hearing by a union official, George Strutt, on a separate, albeit similar, bill. Strutt commented that that other bill "merely clarifies the present law on average weekly wages . . . [and] is merely designed to clarify the present practice used in Connecticut, and to provide the protection for workers whose condition develops after retirement." Conn. Joint Standing Committee Hearings, Labor and Public Employees, Pt. 1, 1990 Sess., p. 318. If that kind of language had been repeated in the legislative debate, there would be a stronger case for retroactivity. One isolated statement by a nonlegislator at a

---

[2] The legislative history contains the following colloquy:

"[Representative Francis X.] O'Neill: (98th) Representative Adamo, I'm just reading here in the OLR bill analysis . . . and it says, establishes a new method for calculating the average weekly wage of a claimant, etc. etc. with occupational disease. Is this going to increase or lower the payments?

"Speaker [Richard J.] Balducci: Representative Adamo.

"[Representative Joseph A.] Adamo: (116th) Through you, Mr. Speaker, our thought is that it will probably become static. It simply puts into law a standard not there now, commissioner, I'm sorry, Representative.

"[Representative] O'Neill: (98th) Through you, Sir, then it could raise it or it could lower it or it could maintain the status quo?

"[Representative] Adamo: (116th) Through you, Mr. Speaker, my sense is that it will probably most likely retain the *status quo*. As I stated earlier, it just put the statute, a method of doing it. Right now the statutes are silent. In most of these cases that are litigated, I think it would save litigation." (Emphasis added.) 33 H.R. Proc., Pt. 7, 1990 Sess., p. 2305.

public hearing on a different, albeit similar, bill is not enough, however, to establish a strong showing of legislative intent of retroactivity, particularly where, as here, the bill as passed has the new, two part calculation discussed previously.[3]

Having concluded that § 31-310c is not retroactive, and therefore cannot govern this case, I turn to the next question: what statute, if any, does control? The Appellate Court reasoned that because the decedent became incapacitated by the disease long after he had ceased working for the employer, the benefits calculation of General Statutes (Rev. to 1989) § 31-306 (2) ("the average weekly earnings of the deceased [employee] at the time of [his] injury") yielded nothing because he was not working at that time. *Green* v. *General Dynamics Corp.*, 44 Conn. App. 112, 119, 687 A.2d 550 (1996). From this, the court reasoned that, therefore, no benefits were payable to the dependent widow. Id. This reasoning seems to allow the tail to wag the dog.

If an employee died from an occupational disease while still employed, pursuant to General Statutes (Rev. to 1989) § 31-306 (2) his dependents would get benefits calculated under General Statutes (Rev. to 1989) § 31-310. Under that calculation formula, if he had worked for the employer for two weeks or more, his average weekly wages or earnings are calculated by taking his total wages for the twenty-six weeks prior to the injury or incapacity and dividing that total by the number of weeks he actually works. If he had worked, however,

---

[3] I recognize that we recently inferred retroactive intent on a similar record in *Toise* v. *Rowe*, 243 Conn. 623, 707 A.2d 25 (1998). That case, however, is distinguishable. The public hearing witness was an official of the state agency that was affected. There was a preexisting conflict between the agency's understanding of the law and a regulation that created a controversy. There was no legislative history to the contrary, and the statute determined to be retroactive did not have a wholly new standard, as § 31-310c does.

for less than two weeks, his average weekly wage "shall be considered to be equivalent to the average weekly wage prevailing in the same or similar employment in the same locality at the time of injury . . . ." General Statutes (Rev. to 1989) § 31-310.

This formula, however, does not specifically cover the case in which, as in this case, the employee died from the occupational disease long after he had stopped working for the employer in whose employment he had contracted the disease. This circumstance leaves the court with two alternatives: (1) we could conclude, as the Appellate Court did, that no benefits are payable; or (2) we could attempt to determine from the available statutory language what benefits *are* payable. I conclude that the second alternative is more consistent with the entire workers' compensation statutory scheme.

First, as the majority points out, workers' compensation legislation is remedial. Second, it cannot be said that the legislature, by neglecting to articulate a specific calculation formula for this kind of situation, intended the dependents to have no coverage. It is likely that many occupational diseases do not manifest themselves until years later. I do not think that the legislature meant to cover only those that have a short enough latency period that the diseased workers become incapacitated while still working. That would be a bizarre result, and would result in a windfall to the employer.

The judicial task, therefore, is to determine what statute reasonably might be said to apply. The only one available, it seems to me, is that part of General Statutes (Rev. to 1989) § 31-310 that applies when the employee worked less than two weeks. In the absence of this problem, I think that that language was not intended to cover this kind of case. Rather, it seems to have been

directed at the situation where the employee did work for the employer immediately preceding the date of incapacity but for less than two weeks. The language is at least susceptible of a meaning that covers this case because in a literal sense, the decedent worked for the employer "less than a net period of two calendar weeks" immediately prior to his incapacity—namely, zero weeks. This would indicate that the benefits are to be calculated under that part of General Statutes (Rev. to 1989) § 31-310, which means the prevailing wage at the time of the decedent's incapacity. Because that figure was never calculated, the case would have to be remanded to the workers' compensation commissioner to make that calculation.

I would, therefore, reverse the judgment of the Appellate Court and remand the case to that court for further remand to the workers' compensation commissioner for calculation of the plaintiff's dependent death benefits under General Statutes (Rev. to 1989) § 31-310.