JOAN RICIGLIANO *v.* IDEAL FORGING
CORPORATION ET AL.
(SC 17597)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

724

Argued October 17—officially released December 26, 2006

*Robert F. Carter,* with whom were *Donna Civitello* and *Richard Gross,* for the appellant (plaintiff).

*Richard Bartlett,* with whom were *Brian E. Prindle, Laurence P. McLoughlin* and *Jennifer Owens,* for the appellees (named defendant et al.).

*Amy M. Stone* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Opinion*

KATZ, J. The issue we must decide in this appeal is when the limitations period under General Statutes § 31-294c (a)[1] commences for filing a workers' compen-

[1] General Statutes § 31-294c (a) provides: "No proceedings for compensation under the provisions of this chapter shall be maintained unless a written notice of claim for compensation is given within one year from the date of the accident or within three years from the first manifestation of a symptom of the occupational disease, as the case may be, which caused the personal injury, provided, if death has resulted within two years from the date of the accident or first manifestation of a symptom of the occupational disease,

sation claim for an occupational disease if a claimant is diagnosed with a disease but has no knowledge of the causal connection between the disease and workplace exposure until some later point in time. The plaintiff, Joan Ricigliano, appeals from the decision of the compensation review board (board) affirming the decision of the workers' compensation commissioner for the sixth district (commissioner) granting the defendants'[2] motions to dismiss the plaintiff's claim on the ground that her decedent, Francesco Ricigliano, the plaintiff's husband (claimant), had not timely filed his claim for compensation. The board concluded that the commissioner properly had determined that the limitations period commenced when the claimant was diagnosed with the disease for which he thereafter sought compensation. We reverse the board's decision.

The record reveals the following undisputed facts. The claimant worked for the named defendant, Ideal Forging Corporation (Ideal Forging), for a period of

a dependent or dependents, or the legal representative of the deceased employee, may make claim for compensation within the two-year period or within one year from the date of death, whichever is later. Notice of a claim for compensation may be given to the employer or any commissioner and shall state, in simple language, the date and place of the accident and the nature of the injury resulting from the accident, or the date of the first manifestation of a symptom of the occupational disease and the nature of the disease, as the case may be, and the name and address of the employee and of the person in whose interest compensation is claimed. An employee of the state shall send a copy of the notice to the Commissioner of Administrative Services. As used in this section, 'manifestation of a symptom' means manifestation to an employee claiming compensation, or to some other person standing in such relation to him that the knowledge of the person would be imputed to him, in a manner that is or should be recognized by him as symptomatic of the occupational disease for which compensation is claimed."

[2] The defendants in this action are: the employers of the plaintiff's decedent, Ideal Forging Corporation and Rex Forge (defendant employers); and the defendant employers' insurers, Liberty Mutual Insurance Company, St. Paul Fire and Marine Insurance Company, Berkley Administrators, EBI Companies, Hartford Insurance Group, Travelers Property and Casualty Corporation, CBIA Comp Services and Royal and SunAlliance.

time that ended in 2000. Sometime between September, 1996, and November 22, 1996, the claimant was diagnosed with multiple myeloma, a cancer of the plasma cell. On February 5, 1998, the claimant sought an evaluation by physicians at the Yale Occupational and Environmental Medicine Program (Yale physicians) to determine whether there was a link between the chemicals that he worked with and his multiple myeloma. In a letter dated March 2, 1998, the Yale physicians indicated that they had reviewed the material safety data sheets[3] listing the chemicals to which the claimant had been exposed at his job and that they had reviewed medical literature regarding those occupational agents. The Yale physicians further informed the claimant therein that they had concluded that there was "no conclusive evidence, at this time, to support an association between your occupational exposures and multiple myeloma."

In 2002, the claimant sought a medical opinion from John Meyer, an occupational disease specialist at the University of Connecticut School of Medicine. In a letter dated July 8, 2002, Meyer informed the claimant that he had determined, to a reasonable degree of medical certainty, that the claimant's exposure to petroleum products and hydrocarbon fuels at his workplace was "the causative factor in his current condition of multiple myeloma." On August 15, 2002, the claimant filed a notice of claim for compensation for a June 16, 2000 injury,[4] specifically, "[m]ultiple [m]yeloma as a result of exposure to various chemicals at Ideal Forging." On

---

[3] The Occupational Safety and Health Administration has enacted federal regulations that require, inter alia, "all employers to provide information to their employees about the hazardous chemicals to which they are exposed, by means of a hazard communication program, labels and other forms of warning, material safety data sheets, and information and training." 29 C.F.R. § 1910.1200 (b) (2006).

[4] " 'Date of the injury' means, for an occupational disease, the date of total or partial incapacity to work as a result of such disease." General Statutes § 31-275 (5).

March 31, 2003, the claimant died, and the plaintiff thereafter filed an amended notice of claim for compensation for the claimant's death due to multiple myeloma.

The defendants thereafter filed motions to dismiss the action for lack of subject matter jurisdiction on the ground that the claims had been filed untimely. Specifically, they contended that the three year limitations period under § 31-294c (a) for filing a workers' compensation claim for an occupational disease had commenced no later than November 22, 1996, the date on which the claimant was diagnosed with multiple myeloma. In response, the plaintiff claimed that the limitations period had commenced on July 8, 2002, the date on which the claimant first learned that there was a causal connection between his disease and his employment. The commissioner concluded that the claim had been filed beyond the three year limitations period because the manifestation of a symptom of the claimant's disease had occurred upon his diagnosis on November 22, 1996. Accordingly, the commissioner granted the defendants' motions to dismiss the action.

Pursuant to General Statutes § 31-301, the plaintiff appealed from the commissioner's decision to the board, which affirmed the decision. The board identified the legal issue as whether " 'the first manifestation of a symptom of the occupational disease' [as prescribed in § 31-294c] occurs upon the initial emergence of a symptom that is, or should reasonably be, linked to the disease in question (here, multiple myeloma), or whether 'first manifestation' does not occur until the disease is not only identified, but also causally linked to exposure at the employee's workplace, thereby qualifying it as an occupational disease." The board noted this court's decisions in *Bremner* v. *Eidlitz & Son, Inc.*, 118 Conn. 666, 174 A. 172 (1934), and *Discuillo* v. *Stone & Webster*, 242 Conn. 570, 698 A.2d 873 (1997), construing the statute, but concluded that *Bremner* had

not resolved this specific question and that *Discuillo*'s discussion of the issue supporting the plaintiff's construction was merely dicta. The board acknowledged that several of its decisions in recent years had implied that the limitations period does not commence until a claimant has a basis for knowing the causal connection between the disease and the employment. The board, however, found more persuasive a 1939 decision by this court examining a 1927 amendment to the statute of limitations and concluded that this opinion suggested that the amendment was intended to tie the statute of limitations for both occupational diseases and accidental injuries to the initial occurrence date, independent of the claimant's awareness of the compensability of the claim. See *Gavigan* v. *Visiting Nurses Assn.*, 125 Conn. 290, 292, 4 A.2d 923 (1939). The board also pointed to proposed amendments to the statute of limitations that had been rejected in 1980 by a legislative committee that would have prescribed a "date of documented discovery" as the triggering event for the limitations period. Finally, the board reasoned that the narrower construction was more consistent with the public policy expressed in other statutes of limitations that set fixed periods for bringing causes of action.

The plaintiff appealed from the board's decision to the Appellate Court, pursuant to General Statutes § 31-301b. We thereafter transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

As the board's decision correctly indicates, this appeal hinges on the meaning of the statutory phrase "first manifestation of a symptom of the occupational disease," the triggering event for the statute of limitations for occupational diseases under § 31-294c. Under our well settled standard of review, "[c]ases that present pure questions of law . . . invoke a broader standard of review than is ordinarily involved in deciding

whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . We have determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . ." (Internal quotation marks omitted.) *Sikand* v. *Wilson-Coker*, 276 Conn. 618, 626, 888 A.2d 74 (2006). This appeal presents the unusual situation wherein the board's decision indicates that the interpretation applied by the board and the commissioner is not only contrary to a prior interpretation of the statute by this court, albeit what the board deemed dicta, but also contrary to several of the board's prior decisions indicating a broader construction than the board applied in the present case. Accordingly, we afford no deference to the board's interpretation of the statute and exercise plenary review over the issue in this appeal.

General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." The defendants contend that § 31-294c has a plain meaning that compels the conclusion that the date of diagnosis controls, and we therefore should not consider extratextual sources because the statute does not require that the claimant have a medical report establishing a definitive link between the claimant's disease and workplace exposure.[5] We disagree with the defendants' plain meaning

---

[5] We disagree with the defendants' characterization of the plaintiff's claim as construing the statute to require that a claimant receive a medical opinion establishing this causal link. Rather, we construe the plaintiff's claim to be

argument. In addition to the fact that the statute also does not refer to the date of diagnosis, the phrase on which the defendants rely, we note that the prior decisions by this court and the board, cited by the board in its decision in the present case, are not consistent with the defendants' "plain meaning" construction of the statute.

"Accordingly, our analysis is not limited, and we, therefore, apply our well established process of statutory interpretation, under which we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Old Farms Associates* v. *Commissioner of Revenue Services*, 279 Conn. 465, 480–81, 903 A.2d 152 (2006).

We begin with the text of § 31-294c (a), which provides in relevant part: "No proceedings for compensation under the provisions of this chapter shall be maintained unless a written notice of claim for compensation is given . . . within three years from the first manifestation of a symptom of the occupational disease . . . which caused the personal injury . . . . As used in this section, 'manifestation of a symptom' means manifestation to an employee claiming compensation, or to some other person standing in such relation to him that the knowledge of the person would be imputed

that the statute requires actual or constructive knowledge of the causal connection and that, *in the present case*, the claimant had no such knowledge until Meyer informed him of that connection.

to him, in a manner that is or should be recognized by him as symptomatic of the occupational disease for which compensation is claimed."[6]

At the outset, we note that the term "occupational disease" is statutorily defined. General Statutes § 31-275 (15) provides that " '[o]ccupational disease' includes any disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such, and includes any disease due to or attributable to exposure to or contact with any radioactive material by an employee in the course of his employment." This court has had numerous occasions to consider the meaning of that term and has explained: "In interpreting the phrase occupational disease, we have stated that the requirement . . . refers to those diseases in which there is a causal connection between the duties of the employment and the disease contracted by the employee. In other words, [the disease] need not be unique to the occupation of the employee or to the work place; it need merely be so distinctively associated with the employee's occupation that there is a direct causal connection between the duties of the employment and the disease contracted." (Internal quotation marks omitted.) *Estate of Doe* v. *Dept. of Correction*, 268 Conn. 753, 758, 848 A.2d 378 (2004).

Thus, embodied in the term "occupational disease" in § 31-294c is a requirement of proof of a causal connection between the employment and the disease. Accord-

---

[6] We note that the plaintiff's claim, as distinct from that of the claimant himself, is governed by different language in § 31-294c. See footnote 1 of this opinion setting forth the text of § 31-294c (a) and the limitations period for claims by dependents or the legal representative of a deceased employee. We further note that, although the parties disagree as to whether the commissioner's decision disposed of the plaintiff's claim, as well as that of the claimant, they appear to agree that a conclusion by this court that the claimant's workers' compensation claim is not time barred would require new proceedings on both claims.

ingly, when the legislature defined "manifestation of a symptom" in § 31-294c (a) as a "manifestation to an employee claiming compensation . . . in a manner that is or should be recognized by him as symptomatic of the *occupational disease* for which compensation is claimed"; (emphasis added); it more specifically prescribed such a manner that is or should be recognized by the employee as symptomatic of the "disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such"; General Statutes § 31-275 (15); for which compensation is claimed. This language strongly suggests that the legislature intended for the claimant to recognize the disease as one causally connected to his employment before the limitations period would commence.

Fortunately, in definitively resolving this question, we are not writing on a blank slate. We turn, therefore, to the genealogy of § 31-294c and an examination of our case law construing this provision. The phrase "first manifestation of a symptom of the occupational disease" originated in a 1927 amendment to the statute of limitations; see Public Acts 1927, c. 307, § 5; which previously had prescribed that the limitations period for work-related injuries would commence on the date of the injury. See General Statutes (1918 Rev.) § 5360. The 1927 amendment prescribed a limitations period of "one year from the date of the accident or from the first manifestation of a sympto[m] of the occupational disease . . . which caused the personal injury," but further provided a period of repose such that "no claim for an occupational disease shall be made by an employee or his dependents against the employer in whose employ the disease is claimed to have originated, except while the employee is still in such employ, or within three years after leaving such employ." Public

Acts 1927, c. 307, § 5, codified at General Statutes (1930 Rev.) § 5245.

In 1934, in *Bremner* v. *Eidlitz & Son, Inc.*, supra, 118 Conn. 667, this court construed this statute of limitations in an appeal brought by the testatrix of the estate of the claimant, Alexander Bremner, who had been denied compensation on the ground that his claim had been filed more than one year after his first manifestation of a symptom of his occupational disease. Bremner, a stonecutter, had sought medical attention in January, 1931, after manifesting symptoms of shortness of breath, coughing and raised sputum. Id. The physicians treating Bremner initially diagnosed him with pneumoconiosis, probably associated with tuberculosis, but subsequently concluded that he did not have active tuberculosis. After his cold and cough symptoms had returned, a physician diagnosed him with chronic bronchitis. Id. Bremner did not file a claim until March, 1933, contending that he did not know until within one year prior to filing the claim that he had silicosis,[7] the symptoms of which, in its early stages, are similar to bronchitis, or any other occupational disease. Id., 668. Bremner claimed before the commissioner "as [a] matter of law that he was not bound to give written notice of a claim

---

[7] Silicosis "is the oldest known occupational lung disease, and it is caused by exposure to inhaled particles of silica, mostly from quartz in rocks, sand, and similar substances. . . . [W]orkers . . . at risk for the development of silicosis . . . include miners, foundry workers, stonecutters, potters and ceramics workers, sandblasters, tunnel workers and rock drillers. . . . Chronic silicosis [the least advanced form of the disease] may take [fifteen] or more years of exposure to develop." 4 Gale Encyclopedia of Medicine (1999), p. 2629. Interestingly, silicosis belongs to a group of lung disorders called pneumoconioses, consistent with Bremner's initial diagnosis. Id. Thus, it appears that the misinformation that Bremner received from his physicians may have been twofold: first, as to the nonemployment-based cause of his lung disorder—tuberculosis; and later as to his diagnosis of chronic bronchitis. Therefore, Bremner's initial diagnosis may be similar to the claimant's in the present case—a disease correctly diagnosed, but with an incorrect, nonemployment related etiology.

for compensation except within one year from the date when it became actually known to him that he was suffering from an occupational disease." Id. The commissioner rejected Bremner's legal claim and thus made no ruling on Bremner's factual claim that he had not actually known that he was suffering from an occupational disease until within one year prior to March of 1933. Id.

This court reversed the decision, concluding that the commissioner had applied an incorrect principle in dismissing the claim. Id., 672. In reaching that conclusion, the court reasoned as follows: "No doubt the legislature used the word manifestation . . . intending that the duty of giving notice, and the risk that an employee might forfeit compensation for an occupational disease, should arise only when a symptom of that disease should plainly appear, not when it was merely suspected or doubtful. Beyond this, the word [manifestation] in its use in the provision in question implies two things. One is that the duty to give the notice is not conditioned upon actual knowledge but upon the fact that the symptom of the disease manifests itself; an employee cannot close his understanding to that which is clear and plain, and if the circumstances are such that a reasonable man would clearly recognize the existence of a symptom of an occupational disease, it must be regarded as manifest in the sense of the statute; for in the law it is usually so that what a man ought to know he is conclusively deemed to know. . . . The other implication arising out of the phrase in question is that there must be a clear recognition of the symptom as being that of the occupational disease in question; however plain is the presence of the symptom itself, unless its relation to the particular disease also clearly appears, there cannot be said to be a manifestation of a symptom of that disease.

"But to whom must the symptom so manifest itself? Ordinarily the law does not give a right or impose a liability based upon knowledge, unless it be the knowledge of the particular person whose right or liability is in question. Here the notice which must be given if compensation is to be awarded an employee clearly must be one given by him or by someone in his behalf; and the risk of loss, if it be not given, is personal to him. This very forcibly suggests that the manifestation of a symptom of an occupational disease which sets running the time within which notice is to be given, must mean its manifestation to the employee claiming compensation. Indeed, that this must be so requires little consideration of the possibilities inherent in a construction of the statute which would make his right depend upon the manifestation of a symptom of the disease to others. Most symptoms of disease are not peculiar to one disease alone and their recognition is matter largely within the field of expert medical knowledge; when an employee, feeling ill, visits a physician, the physician may find clearly present a symptom of some serious occupational disease, but he may find other symptoms present suggesting the possibility of some other disease and, until he is more certain, he may well deem it advisable not to inform the employee of the indication of the occupational disease he has found. So, when an employee feels ill, he may go or be sent by his superior to a physician selected by his employer or the insurer and if recognition of a symptom of an occupational disease by such a physician is to set running the time for giving notice of a claim for compensation, there would be present an opportunity for the representative of the employer or the insurer to defeat a just claim for compensation by merely keeping silent. Certainly we cannot impute to the legislature an intent to make the right of a particular employee to compensation depend upon the adventitious knowledge

of others, perhaps strangers to him, or the knowledge of a physician who deems it his duty in the interest of his patient to conceal the actual fact from him, or the knowledge of one the interest of whose employer may well tempt him to keep silent as to the true fact. These examples are by no means intended to exhaust the possibilities of injustice under the law if the manifestation of a symptom of a disease be not construed to mean its manifestation to the employee affected. *The legislature clearly must have intended that the manifestation should be to the employee or someone standing in such a relation to him that the knowledge of such a person would be imputed to him, and be such as is or ought to be recognized by him as symptomatic of an occupational disease.*" (Citation omitted; emphasis added.) Id., 669–72.

The year following the *Bremner* decision, the legislature amended the statute of limitations to include the following definition of "manifestation of a symptom," which essentially mirrored the *Bremner* court's language: "For the purposes of this section, 'manifestation of a symptom' shall be deemed to mean its manifestation to the employee claiming compensation, or to some other person standing in such relation to him that the knowledge of such a person would be imputed to him, in such manner as is or ought to be recognized by him as symptomatic of the occupational disease for which compensation is claimed." Public Acts 1935, c. 230, § 2; see General Statutes (Sup. 1935) § 1613c. This definition is, for all intents and purposes, the same as the current definition at issue in the present case. The legislature's adoption of the *Bremner* court's definition and the absence of any further limiting language strongly suggest that the legislature endorsed the holding in *Bremner*.

In 1997, in *Discuillo* v. *Stone & Webster*, supra, 242 Conn. 571, the court again addressed the meaning of

§ 31-294c, specifically, "whether, under the circumstances of this case, the limitation period within which the plaintiff was required to file his workers' compensation claim began to run before he actually was aware that the heart attack he had suffered was work-related." Although the plaintiff's heart attack had been classified by the Appellate Court as a repetitive trauma injury, a type of injury otherwise recognized as compensable under the workers' compensation scheme, we noted that § 31-294c provided limitations periods only for accidental injuries and occupational diseases. Id., 574–75. We therefore determined that the plaintiff's claim had to fall within one of the two categories under § 31-294c; id., 577–78; and, upon further analysis, concluded that his heart attack must be deemed to have been an accidental injury. Id., 580. In rejecting the plaintiff's claim that the limitations period had been tolled until he learned that his heart attack was caused by the stress of his job, we discussed the *Bremner* holding, stating: "[Section] 31-294 does not contain any provision for tolling the filing period for a claim of accidental injury based on the claimant's lack of awareness of the work-related nature of that injury. The plaintiff relies on *Bremner* v. *Eidlitz & Son, Inc.*, [supra, 118 Conn. 669–72], to support the proposition that the limitation period on his claim should not have begun to run before he had become aware of the nature of his injury. In *Bremner*, this court held that the limitation period for an occupational disease claim *does not begin to run until the claimant knew or should have known that the disease is work-related.* Id., 670. The court based its holding on its interpretation of General Statutes (1930 Rev.) § 5245, that the filing period in occupational disease cases was to be computed from the date of the first manifestation of a symptom . . . . Id., 669. Indeed, § 31-294 not only contains this same language, but also explicitly incorporates the court's interpreta-

tion of that phrase in *Bremner*." (Emphasis added; internal quotation marks omitted.) *Discuillo* v. *Stone & Webster*, supra, 581–82.

Thus, in *Discuillo*, we did not read the *Bremner* holding as limited to misdiagnosis, as the board appeared to conclude in the present case, but, rather, as a broader recognition that there is a knowledge component, actual or constructive, to the commencement of the limitations period for occupational diseases. See *Rossi* v. *Jackson Co.*, 120 Conn. 456, 462–63, 181 A. 539 (1935) (discussing statute at issue in *Bremner* and stating "[i]t seems clear that this statute [enacted by Public Acts 1927, c. 307, § 5] was passed . . . with the legislative purpose to ensure to an innocent employee the right to make his claim if he had been unaware of his right to compensation which had arisen more than one year before, and for the protection of the employer by limiting this right in any event to a period of three years"); see also *Consolidation Coal Co.* v. *Porter*, 192 Md. 494, 506, 64 A.2d 715 (1949) (relying on *Bremner* analysis to construe Maryland workers' compensation statute of limitations similarly commencing upon "the first distinct manifestation" of occupational disease for court's conclusion that limitations period "started to run in this occupational disease case from the time the employee or some one in his behalf knew or had reason to believe that he was suffering from an occupational disease and that there was a causal connection between his disability and occupation"). Indeed, it appears that from the early 1980s to the present, with the apparent exception of the present case, the board has construed § 31-294c as incorporating a knowledge component, as this court did in *Bremner* and *Discuillo*.[8]

---

[8] See, e.g., *O'Leary* v. *New Britain*, 3 Conn. Workers' Comp. Rev. Op. 108, 110 (1986) ("The evidence before the [trial] [c]ommissioner indicated that the claimant did not become aware of any causal relationship between the hearing impairment and the workplace environment until 1981. That knowledge marks the first known manifestation of [a] symptom."); *DeAngelo* v. *Allegheny Ludlum Corp.*, 9 Conn. Workers' Comp. Rev. Op. 126, 127

We observe that an employee like the claimant in *Bremner*, whose symptoms may have been misdiagnosed as a disease unrelated to his employment; see footnote 7 of this opinion; stands in no different position as a practical matter than an employee like the claimant in the present case, whose symptoms correctly were diagnosed but who was told that his disease was not connected causally to his employment. In either case, the claimant had no basis for knowing, at the time of his initial diagnosis, that his disease was compensable under the Workers' Compensation Act, General Statutes § 31-275 et seq. Indeed, just as we recognized in *Bremner* v. *Eidlitz & Son, Inc.*, supra, 118 Conn. 671, that, "[m]ost symptoms of disease are not peculiar to

(1991) (affirming commissioner's decision concluding that statute of limitations began when claimant's physician concluded that claimant's lung disease was causally connected to his employment, not when earlier examination yielded physician's conclusion that he could not state categorically that disease was work-related absent additional information from employer); *Mingrone* v. *Burndy Corp.*, 9 Conn. Workers' Comp. Rev. Op. 252, 253–54 (1991) (reversing commissioner's decision concluding that triggering date for statute of limitations was when claimant became aware of "possible causal relationship between his employment and [his] lung disease" on ground that "[a] possibility or mere suspicion does not satisfy the *Bremner* holding"); *Peters* v. *State*, 10 Conn. Workers' Comp. Rev. Op. 32, 34 (1992) (affirming commissioner's conclusion that statute of limitations commenced when claimant became aware of occupational connection between his cancer and his employment and rejecting respondent employer's argument that claimant should have ascertained sooner that his cancer was work-related); *Santry* v. *Fermont Division, D.C.A.*, 13 Conn. Workers' Comp. Rev. Op. 230, 232 (1995) ("commissioner was required to determine when the claimant knew, rather than merely suspected, that his hearing loss was work-related in order to decide when notice of the claim was due"); *Adams* v. *American Cyanamid Co.*, 14 Conn. Workers' Comp. Rev. Op. 237, 238 (1995) (affirming commissioner's decision finding that limitations period commenced when claimant became aware of causal connection between asthma symptoms and his employment, rather than earlier point in time when etiology of claimant's asthma was unclear); *Uttenweiler* v. *General Dynamics Corp.*, 3110 CRB-8-95-6 (January 8, 1997) (concluding that limitations period did not commence when claimant first experienced lung problems because physician originally did not diagnose claimant with lung disease due to asbestos exposure at work).

one disease alone and their recognition is matter largely within the field of expert medical knowledge," many diseases are not linked exclusively to one cause and it may take advances in medical knowledge to establish the workplace connection.

The construction of § 31-274c given by this court in *Bremner* and *Discuillo* is the most rational construction. The legislature clearly has manifested an intent to compensate employees for disability arising from occupational diseases. It would be illogical, then, in order to preserve his statutory right to compensation for an occupational disease, to require an employee to file a claim at a time when the employee has no rational basis to believe that there is a causal connection between his employment and his disease or symptoms thereof.[9]

The legislature has taken no action since 1927 to change the "first manifestation" language. The legislature's inaction in the face of *Bremner* and its progeny interpreting § 31-294 as requiring that the claimant have actual or constructive knowledge of a causal connection between his symptoms and the work-relatedness of his condition strongly suggests the legislature's acquiescence in this interpretation. See *State* v. *Peeler,* 271 Conn. 338, 427–28, 857 A.2d 808 (2004) ("[A]lthough legislative inaction is not necessarily legislative affirmation . . . we . . . presume that the legislature is aware of [this court's] interpretation of a statute, and that its subsequent nonaction may be understood as a validation of that interpretation. . . . Time and again, we have characterized the failure of the legislature to take corrective action as manifesting the legislature's

---

[9] Although the defendants contended at oral argument before this court that claimants routinely engage in such a practice to preserve a potential claim, we question the efficacy of such a practice, which seems only marginally likely to ameliorate prejudice that may arise from a long delay in the filing of an occupational disease claim.

acquiescence in our construction of a statute." [Internal quotation marks omitted.]), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

Indeed, in the intervening years between this court's decisions in *Bremner* and *Discuillo,* the legislature amended other language in the predecessor statutes to § 31-294c, each time applying a more liberal standard that would ensure that the long latency period for many occupational diseases and the difficulties in establishing connections to the workplace would not unfairly preclude claims for compensation. In 1939, the legislature extended the period of repose by two years; see General Statutes (Sup. 1939) § 1330e; and, in 1959, eliminated the period of repose except in cases when a claim is brought after the employee's death, thus leaving open-ended the possible period for filing a claim in most cases. See Public Acts 1959, No. 580, § 8. Finally, in 1980, the legislature extended the limitations period from one year from the first manifestation of a symptom of an occupational disease to three years from the first manifestation. See Public Acts 1980, No. 80-124, § 5.

The defendants rely heavily on the legislative history surrounding the 1980 amendment as evidence that there is no knowledge component to the statute. Specifically, they point to the fact that bills were proposed to the labor and public employees committee that would have substituted, inter alia, "date of documented discovery that the disease is an occupational disease" for the phrase at issue in this case, "first manifestation of a symptom of the occupational disease." See Raised Committee Bill No. 7, 1980 Sess., § 2. They further point to the fact that this proposal was not favorably reported out of committee and that the legislature instead amended the statute to extend the limitations period to three years from the first manifestation of a symptom.

We reject the defendants' reliance on this legislative history for several reasons. First and foremost, we are

unaware of any occasion in which this court has relied on a legislative committee's rejection of a proposed bill as evidence of the intent of the entire General Assembly, which never voted on or discussed the proposal. Moreover, employer and insurance related representatives testifying before the committee in opposition to the proposed "date of documented discovery" asserted varied grounds for their objections, albeit all predicated on the assumption that the change would provide a longer limitations period. See Conn. Joint Standing Committee Hearings, Labor and Public Employees, Pt. 1, 1980 Sess., pp. 18, 32–33, 69–80, 168–69. The only comment by a legislator as to the committee's intent, however, did not reflect these concerns. Rather, during debate in the Senate on the bill that ultimately was adopted by the General Assembly, which made no change other than to extend the limitations period from one to three years from the first manifestation of a symptom of an occupational disease, Senator Michael J. Skelley explained that, "it was the feeling of the committee that any [workers' compensation] claim should in fact be dealt with regardless of the length of time, but there was some concern about taking the statute of limitations off completely and we extended it by two more years."[10] 23 S. Proc., Pt. 3, 1980 Sess.,

---

[10] The defendants, however, point to the following comments from Representative Walter J. Henderson during the House of Representatives debate on the bill ultimately adopted by the legislature: "Senate Bill [No.] 9 gives employees two more years than they now have to file a claim for an occupational disease instead of one year, an individual will now have three [years] under the terms of the bill. This change is needed because [the] time period for filing a claim starts from when the first manifestation of the symptoms of an occupational [disease] becomes apparent to the worker. It is not easy for a worker to know that the symptoms [he is] experiencing are caused by an occupational disease for a lot of reasons. Not knowing what he works with. Going to who doesn't know about occupational disease or the terms of his employment." 23 H.R. Proc., Pt. 12, 1980 Sess., p. 3457. We acknowledge that Representative Henderson's comments could support the defendants' construction, but we do not find them sufficiently persuasive in light of the fact that the legislature was not changing the "first manifestation" language we had construed in *Bremner* and because there are other meanings that

p. 631. In addition, the proposed bill would have defined "date of documented discovery" to require that the claimant receive this documentation from a licensed physician. Raised Committee Bill No. 7, supra, § 1. This change significantly would have broadened the standard that we have articulated since *Bremner* because it would have eliminated constructive knowledge as well as knowledge from sources other than a licensed physician. Thus, we do not find this history supportive of the defendants' construction.

Finally, we are mindful that the workers' compensation scheme is remedial and is to be construed broadly in favor of those whom the scheme is intended to benefit.[11] *Gartrell* v. *Dept. of Correction*, 259 Conn. 29, 41, 787 A.2d 541 (2002). To the extent that delays in filing occupational disease claims due to a lack of knowledge of the causal connection to employment may give rise to prejudice, employees are more likely than employers to be harmed by such delays, as employees bear the burden of proving that their disease is in fact an occupational disease. See *Estate of Doe* v. *Dept. of Correction*, supra, 268 Conn. 767–68. Should the employer be prejudiced by such delays, it appears that it has a statutory remedy. See General Statutes §§ 31-294b and 31-294c (c). Moreover, as the amicus in the present case correctly points out, the lion's share of any delay between the workplace exposure and the filing of a claim likely will be the latency period of the occupational disease, a period the defendants acknowledge is tolled by the

could be ascribed to his comments. Specifically, these comments may reflect Representative Henderson's recognition that constructive knowledge of the occupational nature of the disease may be imputed to a claimant and that a commissioner's factual determination as to when a claimant had such knowledge rarely will be reversed.

[11] The defendants' reliance on our decision in *Greco* v. *United Technologies Corp.*, 277 Conn. 337, 890 A.2d 1269 (2006), for a different balancing of interests is misplaced. *Greco* addressed a statute of repose, not a statute of limitations.

statute, rather than the period between a diagnosis and an employee's awareness of the etiology of the disease. See *Green* v. *General Dynamics Corp.*, 245 Conn. 66, 72, 712 A.2d 938 (1998) (Noting that the occupational disease of mesothelioma "has an extensively long latency period, between twenty-five and forty years. . . . Such long latency occupational diseases do present unique workers' compensation problems . . . ." [Citations omitted.]). By eliminating the period of repose except in cases brought by the dependents of an employee after the employee's death, the legislature has indicated that the delays inherent in proof of occupational diseases should not trump an employee's right to compensation for a legitimate claim. Indeed, a majority of jurisdictions requires that the claimant have actual knowledge or a reasonable basis for knowing the causal connection between his symptoms and his work environment before the statute of limitations commences for filing a claim for compensation for an occupational disease. See 7 A. Larson & L. Larson, Workers' Compensation Law (2006), § 126.05 [2], p. 126-20 n.4 and accompanying text; 86 A.L.R.5th 295, § 18 (2001).

In the present case, the board correctly framed the legal question as whether " 'the first manifestation of a symptom of the occupational disease' occurs upon the initial emergence of a symptom that is, or should reasonably be, linked to the disease in question (here, multiple myeloma), or whether 'first manifestation' does not occur until the disease is not only identified, but also causally linked to exposure at the employee's workplace, *thereby qualifying it as an occupational disease.*" (Emphasis added.) As the question itself suggests, the fact that an occupational disease cannot be qualified as such until a causal connection can be established compels the conclusion that such a connection is a prerequisite to the commencement of the statute of limitations for making a claim for an occupational

disease. In the present case, the limitations period commenced in July, 2002, when the claimant first learned that there was a causal connection between his disease and his employment. Accordingly, his claim was filed in a timely manner.

The board's decision is reversed and the case is remanded to the board with direction to reverse the decision of the commissioner, and to remand the case to the commissioner for further proceedings.

In this opinion the other justices concurred.