GREGORY TRACY, ADMINISTRATOR (ESTATE OF
JAMES TRACY) *v.* SCHERWITZKY GUTTER
COMPANY ET AL.
(SC 17498)

Borden, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued February 15—officially released August 1, 2006

*Brian W. Prucker,* for the appellant (plaintiff).

*Joseph J. Passaretti, Jr.,* with whom, on the brief, was *Kristin K. Stein,* for the appellees (defendants).

*Opinion*

ZARELLA, J. The sole issue presented by this appeal is whether home convalescent care of a nonmedical nature rendered to a workers' compensation claimant by a member of the claimant's family is compensable under the Workers' Compensation Act (act), General Statutes § 31-275 et seq. The plaintiff, Gregory Tracy, the administrator of the estate of James Tracy, appeals from the decision of the compensation review board (board) affirming the decision of the workers' compensation commissioner for the first district (commissioner) that the named defendant, Scherwitzky Gutter Company,[1] James Tracy's former employer, is not liable for providing such compensation. We affirm the decision of the board.

The record reveals the following facts. James Tracy (decedent) was employed by the defendant as a gutter installer. On October 7, 1999, the decedent was working on the roof of a two-story home when he fell to the ground below, suffering multiple fractures and traumatic brain injury. These injuries were compensable under the act.

Shortly after the accident, the decedent was taken to Hartford Hospital, where he was diagnosed and received appropriate treatment. Thereafter, on December 2, 1999, the decedent was transferred to Gaylord Hospital, where he was treated by Alyse B. Sicklick, a physician, among others. The decedent was discharged into the care of his sister, Julia Morrisette, on February 11, 2000. At the time of the decedent's discharge, Sicklick recommended "that he be in a supervised set-

---

[1] American States Insurance Company, Scherwitzky Gutter Company's workers' compensation insurance carrier, also was named as a defendant. In the interest of simplicity, we refer to Scherwitzky Gutter Company as the defendant throughout this opinion.

ting, alone for only short periods of time with frequent checks."

The decedent's mental faculties were considerably reduced as a consequence of his injuries. His memory was diminished such that he would forget to take his medications or would eat until he vomited, unaware that he had eaten a meal a few minutes earlier. The decedent also became unable to conduct himself in a safe manner and, consequently, would wander off alone, unsuccessfully attempt to cook his own meals,[2] and attempt to mount the roof when he believed that a gutter needed repair.

The record is unclear as to whether the full extent of these symptoms was evident during the decedent's time with Morrisette. The burden of caring for the decedent, however, was too much for Morrisette, and, on March 28, 2000, the decedent began living with his nephew, the plaintiff, and the plaintiff's wife, Susan Tracy.[3] On July 25, 2000, the Griswold Probate Court appointed the plaintiff as conservator of the decedent.

Between March 28, 2000, and November 29, 2001, the Tracys cared for the decedent twenty-four hours a day, seven days a week.[4] This care was later characterized by the plaintiff as "guardian-type care, not medical" in nature. Susan Tracy, who was employed outside of her home as a certified nurse's aide, testified that she and the plaintiff monitored the decedent to prevent him from "[doing] things that he shouldn't do . . . ." They also "provide[d] [the decedent with] everything he really needed," reminding him to take his medications

---

[2] On two occasions, the decedent, not comprehending how to shut off a gas stove, simply blew out the burner flame without cutting off the flow of gas.

[3] We hereinafter refer to the plaintiff and Susan Tracy, the plaintiff's wife, collectively as the "Tracys."

[4] The Tracys sometimes were assisted in their caregiving by their nineteen year old son or Gregory Tracy's mother.

and giving him "cues to eat, cues to change his clothes, cues to wash up," and the like. When the decedent experienced one of his occasional seizures,[5] often accompanied by vomiting or loss of bowel control, the Tracys would calm him and summon an ambulance, if necessary.

Sicklick saw the decedent after his discharge from Gaylord Hospital only once, for a follow-up visit on June 1, 2000.[6] At that visit, Sicklick recommended—in writing, on a prescription pad bearing the name and address of Gaylord Hospital—that the decedent "be alone for only short period[s] of time with frequent checks during that time. Otherwise he should be maintained in a supervised setting." Sicklick also noted in her report of the June 1 visit that the decedent "[was then] living with a nephew, where he ha[d] 24-hour supervision. There continue[d] to be significant memory deficits as well as safety issues." The decedent continued to suffer from these same symptoms until his death on November 29, 2001.

Following the decedent's death, the plaintiff commenced the present action, claiming that (1) he was entitled to benefits for the decedent's death pursuant to General Statutes § 31-306,[7] (2) he was entitled to

---

[5] The decedent had a preexisting medical history of seizures and alcoholism. Although the commissioner made no inquiry into the cause of the decedent's seizures during his stay with the Tracys, the commissioner did find that "the [decedent's] brain injuries from his compensable October, 1999 accident would have long since healed [by the time of the decedent's death], and any seizures he may have been experiencing at or around the time of his death would [have] relate[d] to his longstanding preexisting history of seizures and . . . alcoholism."

[6] The decedent also visited a neurologist, David J. Shiling, three times following his release from Gaylord Hospital. Gregory Tracy testified at the formal hearing that Shiling had said that the decedent "needed 24-hour [per] day supervision," but this testimony was not corroborated by Shiling in his own deposition and was not found as a fact by the commissioner.

[7] General Statutes § 31-306 (a) provides for "[c]ompensation [to] be paid to dependents on account of [a claimant's] death resulting from an accident arising out of and in the course of employment . . . ."

benefits through the date of the decedent's death, and (3) the Tracys were entitled to benefits pursuant to General Statutes § 31-294d[8] for care provided to the decedent prior to his death. The commissioner, after formal hearings, ordered the defendant to pay "total disability benefits" to the plaintiff pursuant to the second claim but dismissed the first and third claims. In reference to the third claim, the commissioner found that the care provided by the Tracys "was not rendered by referral or under the supervision of any physician and does not rise to the level qualifying it for compensation under [§ 31-294d] . . . ." The commissioner correspondingly ordered that "[t]he claims of [the Tracys] for care provided to the [decedent], though laudable and praiseworthy, do not qualify for benefits under [General Statutes §] 31-312 and, as such, must be dismissed." The plaintiff filed a motion to correct the commissioner's findings and order by changing (1) the commissioner's decision to describe the decedent as "under the supervision of a physician on a self pay basis," and (2) the commissioner's reference to § 31-312 in the commissioner's findings and order to § 31-294d. The commissioner denied the plaintiff's motion.

The plaintiff appealed the commissioner's decision only as to the third claim. The board affirmed the commissioner's decision, finding that "[t]he reasoning the . . . commissioner used [was] consistent with the proper analysis under § 31-294d. For this reason, the . . . commissioner's mention of § 31-312 appear[ed] to be a harmless error." The board concluded that the commissioner's finding that the care provided by the Tracys "did not rise to the level of care qualifying . . .

---

[8] General Statutes § 31-294d (a) (1) provides in relevant part: "The employer, as soon as the employer has knowledge of an injury, shall provide a competent physician or surgeon to attend the injured employee and, in addition, shall furnish any medical and surgical aid or hospital and nursing service, including medical rehabilitation services and prescription drugs, as the physician or surgeon deems reasonable or necessary. . . ."

for compensation under [§ 31-294d] . . . is a factual finding that we will not disturb . . . ." The plaintiff appealed from the decision of the board to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

On appeal to this court, the plaintiff claims that the care that the Tracys rendered to the decedent is compensable under § 31-294d.[9] The plaintiff first argues that care provided by a certified nurse's aide, such as Susan Tracy, may constitute "medical aid or rehabilitation services"[10] and, accordingly, that the care provided to the decedent by the Tracys was compensable under § 31-294d.[11] The plaintiff also argues that the Tracys' care of the decedent was medically reasonable and necessary long term custodial care rendered on the basis of the referral, consent, direction and supervision of a physician, and, therefore, was compensable under § 31-294d.

The defendant argues in response that the plaintiff's claim fails both prongs of the two part test established in *Galway* v. *Doody Steel Erecting Co.*, 103 Conn. 431, 435–36, 130 A. 705 (1925), for evaluating the compensability of such claims, namely, whether "the care provided to the injured worker" was (1) "under the direction of a treating physician," and (2) "with the consent of the treating physician . . . ." The defendant

[9] On appeal, the plaintiff does not pursue his claim that the commissioner improperly referred to § 31-312 in his findings and order.

[10] The plaintiff also cursorily argues that "[r]ehabilitation is becoming an increasingly important part of the compensation program . . . ." (Internal quotation marks omitted.)

[11] Citing *Valentino* v. *United Parcel Service*, No. 1907 CRB-4-93-11 (February 1, 1995); see footnote 16 of this opinion; the plaintiff also argues that "long-term custodial care is compensable if agreed to." This argument, however, is factually inapposite to the present appeal insofar as there is no allegation that the Tracys and the defendant reached any agreement regarding the decedent's care.

additionally argues that, even if the *Galway* test were satisfied, the plaintiff's claim nonetheless would fail because the Tracys "were not 'medical providers' as defined by the statute." Finally, the defendant argues that "a finding for the [plaintiff] would be contrary to public policy" insofar as it "would result in administrative nightmares, unending litigation and logistical difficulties," as well as a double recovery for caregivers. We agree with the defendant that the care that the Tracys rendered is not compensable.

"As a threshold matter, we set forth the standard of review applicable to workers' compensation appeals. The principles that govern our standard of review in workers' compensation appeals are well established. The conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . *Besade* v. *Interstate Security Services*, 212 Conn. 441, 449, 562 A.2d 1086 (1989). Neither the . . . board nor this court has the power to retry facts. See *Six* v. *Thomas O'Connor & Co.*, 235 Conn. 790, 798–99, 669 A.2d 1214 (1996). . . . *Doe* v. *Stamford*, 241 Conn. 692, 696–97, 699 A.2d 52 (1997). It is well established that [a]lthough not dispositive, we accord great weight to the construction given to the workers' compensation statutes by the commissioner and [the] board. . . . A state agency is not entitled, however, to special deference when its determination of a question of law has not previously been subject to judicial scrutiny. . . . *Duni* v. *United Technologies Corp.*, 239 Conn. 19, 24–25, 682 A.2d 99 (1996); *Davis* v. *Norwich*, 232 Conn. 311, 317, 654 A.2d 1221 (1995). Where . . . [a workers' compensation] appeal involves an issue of statutory construction that has not yet been subjected to judicial scrutiny, this court has plenary power to review the administrative decision. *Doe* v. *Stamford*,

supra, 697; see *Davis* v. *Norwich,* supra, 317. . . . *Dowling* v. *Slotnik,* 244 Conn. 781, 798, 712 A.2d 396, cert. denied [sub nom. *Slotnik* v. *Considine*], 525 U.S. 1017, 119 S. Ct. 542, 142 L. Ed. 2d 451 (1998)." (Internal quotation marks omitted.) *Fimiani* v. *Star Gallo Distributors, Inc.,* 248 Conn. 635, 641–42, 729 A.2d 212 (1999).

The plaintiff's claim also implicates a question of statutory interpretation. Our review is therefore plenary. E.g., *Parrot* v. *Guardian Life Ins. Co. of America,* 273 Conn. 12, 18, 866 A.2d 1273 (2005). When interpreting a statute, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *Perodeau* v. *Hartford,* 259 Conn. 729, 735, 792 A.2d 752 (2002). To do so, we first consult "the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." General Statutes § 1-2z.

We begin our analysis by looking to the statutory provision under which the plaintiff seeks compensation benefits. General Statutes § 31-294d (a) (1) provides in relevant part that, "as soon as the employer has knowledge of an injury, [it] shall provide a competent physician or surgeon to attend the injured employee and, in addition, shall furnish any medical and surgical aid or hospital and nursing service, including medical rehabilitation services and prescription drugs, as the physician or surgeon deems reasonable or necessary. . . ." As the parties' arguments imply, the plaintiff's attempt to apply this provision to the present situation raises two pertinent questions, both of which must be answered in the affirmative in order for the plaintiff to prevail. First, does the Tracys' care of the decedent

fall within the definition of either "nursing service," "medical . . . aid" or "medical rehabilitation services . . . ?"[12] Second, was the Tracys' care of the decedent deemed "reasonable or necessary" by an attending physician or surgeon?

We first consider the question of whether the Tracys' care of the decedent falls within the definition of either "nursing service," "medical . . . aid" or "medical rehabilitation services" under § 31-294d. This inquiry begins with the plain language of the relevant statutes. The act defines the term "nursing" by reference to General Statutes § 20-87a (a). See General Statutes § 31-275 (14) (unless context otherwise provides, " '[n]ursing' means the practice of nursing as defined in subsection [a] of section 20-87a"). General Statutes § 20-87a (a) provides: "The practice of nursing by a registered nurse is defined as the process of diagnosing human responses to actual or potential health problems, providing supportive and restorative care, health counseling and teaching, case finding and referral, collaborating in the implementation of the total health care regimen, and executing the medical regimen under the direction of a licensed physician, dentist or advanced practice registered nurse."

Although the language of § 20-87a (a) does not compel nursing to take a specific form, it defines the practice of nursing in terms of a patient's "actual or potential health problems," "health counseling and teaching" and "health care" and "medical" regimens. The implication of the statutory text is clear and unambiguous. Medi-

---

[12] The plaintiff does not claim that the care rendered by the Tracys falls within the definition of either "surgical aid," "hospital . . . service" or "prescription drugs."

cally related services are intrinsic to the practice of nursing.[13]

The claim that the Tracys' care of the decedent constitutes a "nursing service" is contradicted by the record in the present appeal, which demonstrates that the Tracys' care of the decedent was purely nonmedical in nature. The Tracys' acts of monitoring the decedent, reminding him to perform basic hygienic and domestic functions, and providing a calming presence for him were all nonmedical in nature. This reality is reflected in the plaintiff's characterization of the care as "guardian-type care, not medical" in nature. The fact that Susan Tracy was a certified nurse's aide is of no avail to the plaintiff. The medical qualifications of a caregiver have no bearing on the pertinent issue, namely, whether the care provided was medical in nature.

---

[13] Moreover, to the extent that the plain statutory language of § 20-87a (a) can be considered ambiguous as to whether nursing embraces nonmedical care, we observe that numerous references to the nature of the practice of nursing in the legislative history of § 20-87a corroborate our conclusion that medically related services are intrinsic to the practice of nursing. See, e.g., Conn. Joint Standing Committee Hearings, Public Health and Safety, Pt. 2, 1975 Sess., p. 896, remarks of Catherine Battista, assistant executive director of the Connecticut Nurses' Association ("[t]he keystone of modern medicine is the identification of a disease and its eradication and the keystone of nursing is the determination of a sympto[m] or the patient's response to the disease"); id., p. 898, remarks of Patsy Mason, vice president of the Connecticut Nurses' Association ("[t]he nature of [nursing] . . . includes diagnosis of human responses to actual or potential hea[l]th problems, physical assessments, taking patient histories and the referral of patients to physicians or other health professionals"); id., p. 911, remarks of Ed Halloran (proposed definition of nursing is result of nurses having "worked together to define their unique function *in the health delivery system*" [emphasis added]); id., p. 936, remarks of Joan Fontanella ("The nursing process involves the recognition of a patient problem or need, selecting an appropriate nursing measure to alleviate that problem, backing up nursing action with sound scientific principles of theory, and later evaluating and modifying that action in light of all data collected. This process encompasses all physical, psychological, and educational needs manifested by the patient.").

Moreover, the Tracys did not provide care "under the direction of a licensed physician, dentist or advanced practice registered nurse," as the definition of "nursing" in § 20-87a (a) requires. Although Sicklick recommended that the decedent live in a supervised setting, the record indicates that the care that the Tracys rendered to the decedent was not under the supervision or direction of Sicklick or any other physician, dentist or advanced practice registered nurse. Therefore, the Tracys' care of the decedent does not constitute nursing service within the meaning of § 31-294d.

The act does not provide any relevant definition of the terms "medical . . . aid" or "medical rehabilitation services,"[14] nor has any Connecticut court considered the meaning of these terms. We need not expound a definition of these terms, however, to conclude that they do not encompass the Tracys' care of the decedent. This is because the Tracys' care of the decedent was nonmedical in nature, and the terms "medical . . . aid" and "medical rehabilitation services," by their own plain language, embrace only medical care.

Our conclusion that purely nonmedical care, such as that provided by the Tracys, is not compensable under § 31-294d is supported by our only previous inquiry into the predecessor to § 31-294d. See *Galway* v. *Doody Steel Erecting Co.*, supra, 103 Conn. 431 (construing General Statutes [1918 Rev.] § 5347).[15] In that case, the plaintiff,

---

[14] General Statutes § 31-275 (12) provides: " 'Medical and surgical aid or hospital and nursing service', when requested by an injured employee and approved by the commissioner, includes treatment by prayer or spiritual means through the application or use of the principles, tenets or teachings of any established church without the use of any drug or material remedy, provided sanitary and quarantine regulations are complied with, and provided all those ministering to the injured employee are bona fide members of such church."

[15] General Statutes (1918 Rev.) § 5347 provides in relevant part: "The employer, as soon as he has knowledge of any . . . injury [sustained by an employee in the course of employment], shall provide a competent physician or surgeon to attend the injured employee, and in addition shall furnish such medical and surgical aid or hospital service as such physician or

Harry T. Galway, was discharged from a three week hospital stay "with the knowledge and expectation on the part of the surgeon that [he] then needed and would need a very considerable amount of nursing, care, and attention from his wife." Id., 432. His wife rendered this care for eleven weeks and subsequently sought compensation from Galway's employer. See id. We rejected the wife's claim, stating that, "in [the] case of [an] injury requiring hospital treatment, an award will be made for services rendered and appliances furnished to the injured employee by another member of his family in lieu of such treatment and in accordance with the consent and direction of the physician in charge, especially when the member rendering such services gives up his regular employment in order to do so." Id., 435–36. We reasoned that "[i]t [was] improbable that [Galway's] surgeon would have [discharged Galway] had [Galway] still needed hospital service . . . ." Id., 436. The care that Galway's wife provided accordingly was not given in lieu of hospital treatment and, therefore, was deemed noncompensable. Id. The same logic applies to the present case. The decedent's postdischarge care was not provided in lieu of hospital treatment and falls outside of the scope of compensable care established by *Galway*.

To be sure, workers' compensation commissioners and the board occasionally have authorized compensation for home convalescent care rendered by a member of an injured employee's family.[16] See, e.g., *Boiano* v.

surgeon shall deem reasonable or necessary. . . ." Although § 5347, like its successor, § 31-294d, encompasses "medical and surgical aid" and "hospital service," it does not encompass the "nursing service . . . medical rehabilitation services and prescription drugs" described in § 31-294d.

[16] Another decision of the board enforced an agreement by the employer's insurer to pay members of the injured employee's family to provide the "round-the-clock, postdischarge care that the [employee] would require." *Valentino* v. *United Parcel Service*, No. 1907 CRB-4-93-11 (February 1, 1995). In *Valentino*, however, the board expressly declined to "determine . . . whether an employer is required under § [31-294d] to compensate a family . . . for services of the kind rendered in [that] case; it is enough to say

*Eppoliti Construction,* No. 2108 CRB-4-94-7 (June 26, 1996); *Mallette* v. *H. C. Field Co.,* 5 Conn. Comp. Dec. 301 (1923); *Stephen* v. *Waterbury Rolling Mill Co.,* 5 Conn. Comp. Dec. 229 (1923); *Lunsmann* v. *Putnam,* 4 Conn. Comp. Dec. 571 (1921); *Swan* v. *New York, New Haven & Hartford R. Co.,* 2 Conn. Comp. Dec. 449 (1917). In nearly all of these decisions, however, the care deemed to be compensable was unmistakably medical in nature. See *Mallette* v. *H. C. Field Co.,* supra, 302 (compensating nurse for providing nursing services to her husband); *Stephen* v. *Waterbury Rolling Mill Co.,* supra, 229 (compensating nurse for tending to her husband for injuries "requir[ing] . . . the attention of a trained nurse"); *Lunsmann* v. *Putnam,* supra, 571 (compensating nurse for performing services to her injured husband that "either would have required a trained nurse or the extension of the period of hospital service"); *Swan* v. *New York, New Haven & Hartford R. Co.,* supra, 449–50 (compensating nurse for dressing her brother's injured foot during his incapacity).

In the most recent of these decisions, *Boiano* v. *Eppoliti Construction,* supra, No. 2108 CRB-4-94-7, the employee, Thomas Boiano, fell approximately sixty feet from a scaffold, suffering extensive injuries that left him incontinent, possessed of an unreliable memory and largely helpless with regard to basic daily activities such as cooking, dressing and showering. Boiano's physician recommended that Boiano "receive home health care for a long period of time," and, consistent with that recommendation, Boiano's wife "constantly chang[ed] and clean[ed] [his] clothes and bedding, monitor[ed] his medications, catheteriz[ed] him, prepar[ed] his food . . . [and] [drove] him . . . ." Id. Boiano's wife left her permanent employment to provide these services. Boiano's former employer and its insurer paid Boiano's wife $100 per week for these services "[d]uring various

---

that the statute does not prevent an employer or insurer from agreeing to compensate [an injured employee's] family for taking care of him." Id.

periods between 1988 and July, 1993." Id. After the employer and its insurer sought to terminate its payments to Boiano's wife, the commissioner found that she should continue to be compensated $100 per week for her services. The board upheld the commissioner's award.

*Boiano* is distinguishable from the present appeal in two respects. First, the home convalescent care that Boiano's wife had provided had a medical aspect to at least part of it, namely, the catheterization of Boiano. Second, Boiano's employer and its insurer had provided compensation to Boiano's wife over a five year period. A reasonable inference can be drawn from these payments that the insurance company was not making those payments gratuitously but, rather, because the services, at least in part, were for compensable services being rendered by Boiano's wife. This circumstance only could have been an additional factor supporting the board's conclusion that the care at issue in *Boiano* was compensable. Cf. *Valentino* v. *United Parcel Service*, No. 1907 CRB-4-93-11 (February 1, 1995) (enforcing express agreement between employer's insurer and injured employee's family to compensate members of employee's family for providing home convalescent care). Because neither of these circumstances exists in the present appeal, *Boiano* is distinguishable.

We next briefly consider the second question of whether the Tracys' care of the decedent was deemed "reasonable or necessary" by an attending physician or surgeon. Our decision in *Galway* indicates that home convalescent care rendered by a member of a patient's family must be "in accordance with the consent and direction of the physician in charge" to be compensable. (Internal quotation marks omitted.) *Galway* v. *Doody Steel Erecting Co.*, supra, 103 Conn. 435–36. The Tracys' care of the decedent, however, was not rendered in accordance with the consent or under the direction of any physician. As we mentioned previously, Sicklick

recommended that the decedent be maintained in a supervised setting. Sicklick did not follow up this recommendation in any active fashion, however. The record reveals no contact between Sicklick and the decedent between the decedent's June 1, 2000 follow-up visit and his death on November 29, 2001. Indeed, Susan Tracy testified that the care that she and the plaintiff had provided to the decedent was not under the direction of any physician—except as to Sicklick's broad dictum that the decedent should be maintained in a "supervised setting"—and did not involve the Tracys reporting to a physician or preparing reports of the care provided. This course of care simply was not "in accordance with the consent and direction of the physician in charge . . . ."[17] (Internal quotation marks omitted.) Id.

The decision of the board is affirmed.

In this opinion the other justices concurred.

---

[17] In light of our determination that the care that the Tracys provided to the decedent is not compensable under § 31-294d because it was neither medical in nature nor deemed "reasonable or necessary" by a physician or surgeon, we need not, and do not, consider the defendant's public policy arguments.