ROBERT W. NELSON *v.* STATE OF CONNECTICUT
(AC 27033)

Flynn, C. J., and Lavine and Dupont, Js.

Argued October 30, 2006—officially released March 6, 2007

*Jennifer Collins*, for the appellant (plaintiff).

*Kenneth H. Kennedy, Jr.*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *William J. McCullough*, assistant attorney general, for the appellee (defendant).

*Opinion*

DUPONT, J. The plaintiff, Robert W. Nelson, appeals from the decision of the workers' compensation review

board (board), which affirmed the decision of the workers' compensation commissioner (commissioner), dismissing his claim for full pay disability benefits pursuant to General Statutes § 5-142 (a).[1] He claims on appeal that the board improperly affirmed the decision of the commissioner by (1) misapplying the statutory requirement of "special hazards inherent" in his job duties and (2) relying on facts not in the record or not found by the commissioner.[2] We agree with the plaintiff as to the first claim and reverse the decision and remand the case to the board with direction to remand the case to the commissioner with direction to award benefits consistent with this opinion. In view of our disposition of the first claim, we need not discuss the second claim.

The issue is whether the plaintiff received a work-related injury under circumstances that the legislature intended would be compensable pursuant to § 5-142 (a), while in the actual performance of his job duties.

[1] General Statutes § 5-142 (a) provides in relevant part: "If any . . . Judicial Department employee sustains any injury (1) . . . while attending or restraining an inmate . . . and (2) that is a direct result of the special hazards inherent in such duties, the state shall pay all necessary medical and hospital expenses resulting from such injury. If total incapacity results from such injury, such person shall be removed from the active payroll the first day of incapacity, exclusive of the day of injury, and placed on an inactive payroll. Such person shall continue to receive the full salary that such person was receiving at the time of injury subject to all salary benefits of active employees, including annual increments, and all salary adjustments, including salary deductions, required in the case of active employees, for a period of two hundred sixty weeks from the date of the beginning of such incapacity. . . ."

[2] The interpretation of the words of General Statutes § 5-142 (a), "special hazards inherent in [his] duties," is intertwined with, and dependent on the facts properly found by the commissioner, properly relied on by the board or which were undisputed relevant facts presented to the commissioner. Contrary to the argument of the plaintiff, the board's statement that "the [plaintiff] was not preventing or stopping the suicide, nor was he restraining the prisoner" was not an improper finding of a fact not found by the commissioner but the board's attempt to summarize evidence. See *Johnson* v. *State*, 67 Conn. App. 330, 786 A.2d 1260 (2001), cert. granted, 259 Conn. 924, 792 A.2d 854 (2002) (appeal withdrawn March 28, 2002).

We must determine whether, on the basis of the facts of this case, § 5-142 (a) (2) is satisfied when an otherwise qualified employee responds rationally to what he perceives to be a dangerous situation, which later proves to be a situation caused by a suicidal act of an inmate. The answer to our question depends on the facts in this case and prior, relevant decisions, which have interpreted the phrase "special hazards inherent" in the duties of employees potentially covered in § 5-142 (a) (2). The plaintiff testified at the hearing before the commissioner[3] and introduced two exhibits into evidence, one, a written report of the incident causing his injury, and the other, a written report of a coworker's report of the incident. The facts culled from the exhibits and testimony relevant to our disposition of this appeal follow.

The plaintiff was a marshal at the Superior Court in Danbury, employed by judicial branch at the time of his injury on August 15, 2002. The plaintiff had been requested to go to the cell block in the courthouse to get two prisoners in order to bring them to the courtroom. He called the name of one of the prisoners but got no response. He looked into that prisoner's cell and saw the prisoner standing up, shaking and wobbly on his feet. The plaintiff "looked down and there was a huge puddle of blood on the floor." He then saw the prisoner fall to the floor, thereby partially blocking the door to the cell. The prisoner's body was wedged in such a way that if the door was pushed "anywhere from six inches to a foot it probably would end up snapping his neck." The plaintiff called for medical assistance and squeezed into the cell to "either render first aid or find out what was going on." The plaintiff did not know that the prisoner had slit his wrist until looking over his body. The plaintiff testified that he "found out after

---

[3] A transcript of the testimony was available to this court. None of the testimony of the plaintiff was disputed by the commissioner.

[that] he slit his wrists when they found razor blades inside his cell." When the plaintiff entered the cell, he did not know if the prisoner was "faking" or in need of help.[4]

In response to a question on cross-examination as to whether the prisoner could have been a threat, the plaintiff answered: "You know, at the time, maybe, I mean, he could have, if, maybe, he was faking [that] he was unconscious and then came at me. I don't know. That's why it was such a quick reaction to pull him away from the door and get another officer in and then render first aid, which we found out that he slit his wrists."

The plaintiff testified that even though the prisoner was unconscious after he entered the cell, the prisoner remained a threat because "anyone committing suicide is a dangerous person to you or me" and that the inmate "is a prisoner, first of all, and you are dealing with what I had to deal with [which] was the blood exposure." The plaintiff injured his back in moving the prisoner's body further away from the door in order to facilitate the medical personnel's entry into the cell. The plaintiff used paper towels to staunch the blood and to apply pressure to the wounds. The plaintiff testified that his hands were "slipping from blood" and that the incident was "not at all a normal occurrence." Both of the plaintiff's arms were exposed to blood, and he required "some blood work" because of that exposure.[5] After an ambulance arrived, the plaintiff accompanied the prisoner to a hospital in order to guard him.[6]

---

[4] There is no indication in the record as to the crime with which the prisoner was charged.

[5] The claim of total disability does not involve any adverse consequences arising from the contact with the prisoner's blood.

[6] The prisoner's attempt to commit suicide was thwarted because he did not die as a result of his act.

The plaintiff requested full pay benefits pursuant to § 5-142 (a) for the period during which he was unable to work due to total incapacity. The commissioner found that the injury did not directly arise from "any special hazard inherent in the job duties of a marshal" and so denied § 5-142 (a) benefits. Specifically, the commissioner noted that "[a]lmost any employee in any business, or, indeed, any individual in ordinary, everyday circumstances could be called upon to assist a fallen individual—whether the result of a fainting episode, a fall on ice episode, a motor vehicle accident or any of a number of daily occurring experiences." The board affirmed the decision of the commissioner.

The precise question of the statutory interpretation of "special hazards inherent" as applied to the facts of this case has not yet been decided, although the phrase has been interpreted in the context of other facts. See *Johnson* v. *State*, 67 Conn. App. 330, 786 A.2d 1260 (2001), cert. granted, 259 Conn. 924, 792 A.2d 854 (2002) (appeal withdrawn March 28, 2002). This case, therefore, is not the usual one of a prior interpretation of statutory words by the board or an appellate court, to which we would accord deference. See *Tracy* v. *Scherwitzky Gutter Co.*, 279 Conn. 265, 272, 901 A.2d 1176 (2006). The interpretation adopted by the commissioner and the board as applied to these facts has not precisely been subjected to judicial review, causing us to exercise plenary review. See *Ricigliano* v. *Ideal Forging Corp.*, 280 Conn. 723, 728–29, 912 A.2d 462 (2006).

The interpretation of a statute is a question of law. See, e.g., *Tracy* v. *Scherwitzky, Gutter Co.*, supra, 279 Conn. 273. We recognize, however, that the legislature, by creating the workers' compensation commission and the board, has entrusted to them the primary responsibility of determining workers' compensation claims. Further, we recognize that the board usually has had

experience both with the statute and also with the legislative program of which the statute is a part. Thus, we look to the prior decisions of the board and to the board's decision here, as well as to our latest interpretation of § 5-142 (a) as discussed in *Johnson* v. *State*, supra, 67 Conn. App. 330, in exercising our plenary review.[7]

"[T]o be eligible for benefits under § 5-142 (a), the state employee must (1) be a member of a specified group of state employees, (2) be engaged in the performance of a specified duty, and (3) the injury sustained must be as a result of special hazards inherent in such duties. (Internal quotation marks omitted.) *Stuart* v. *Dept. of Correction*, 221 Conn. 41, 42 n.1, 601 A.2d 539 (1992). The covered group of employees includes "any Judicial Department employee . . . ." General Statutes § 5-142 (a). To be covered, the employee must be engaged in "making an arrest or in the actual performance of . . . guard duties . . . or while attending or restraining an inmate . . . or as a result of being assaulted in the performance of his duty . . . . " (Internal quotation marks omitted.) *Stuart* v. *Dept. of Correction*, supra, 44. The plaintiff has the burden to prove that he has satisfied the statutory requirements. See *Bidoae* v. *Hartford Golf Club*, 91 Conn. App. 470, 483, 881 A.2d 418, cert. denied, 276 Conn. 921, 888 A.2d 87 (2005), cert. denied, U.S. , 126 S. Ct. 1916, 164 L. Ed. 2d 665 (2006); see also *Johnson* v. *State*, supra, 67 Conn. App. 335 n.4.

There is no dispute that the plaintiff satisfies the first requirement of § 5-142 (a), namely, that he is among the class of protected workers. There was some dispute

[7] No deference is given to a board's decision, however, if its interpretation of a statute, on the basis of similar facts, is contrary to a prior interpretation of a previous board decision or to an interpretation of the same statutory provision by an appellate court. See *Ricigliano* v. *Ideal Forging Corp.*, supra, 280 Conn. 728–29.

at oral argument as to whether he was "restraining" the prisoner under the statute when he was preventing the flow of blood from the prisoner. It is unnecessary to determine whether stopping the blood flow of a fallen prisoner constitutes "restraining" under the statute because the statute provides that the injury to the worker can also be sustained while "attending," as well as "restraining," an inmate. The plaintiff was a protected worker who was "attending" a prisoner when injured.

The primary issue in this case is whether the plaintiff produced sufficient evidence to show that his injury was the "direct result of the special hazards"; General Statutes § 5-142 (a); in his employment. The term "special hazards" is not defined in the statute itself. Further, although the term occasionally arises in various unrelated contexts in our case law; see, e.g., *Kuharski* v. *Bristol Brass Corp.*, 132 Conn. 563, 565, 46 A.2d 11 (1946); there is also no common-law definition of the term. To interpret the term's statutory meaning, we begin with the statutory language itself. *Lucarelli* v. *State*, 16 Conn. App. 65, 68–69, 546 A.2d 940 (1988). The statute provides that if a covered employee is engaged in a covered activity and "sustains any injury . . . that is a direct result of the special hazards inherent in such duties" the statute is satisfied. General Statutes § 5-142 (a). We examined the overall intent of a previous version of the statute in *Lucarelli* v. *State*, supra, 69–70. There we noted that "[t]he classifications of state employees enumerated in the provision share a common characteristic: these employees, in the daily course of performing their duties, work in an atmosphere sometimes charged with emotion and stress, and face the possibility of confrontations with inmates, patients or arrestees, which confrontations often result in violence." Id., 69. The general intent of the statute, we found, was to recognize the heightened dangers certain employees face. Id.

We also accord weight to the fact that the Workers' Compensation Act; General Statutes § 31-275 et seq.; is remedial and the fact that its provisions should be construed broadly in favor of those whom the statutory scheme was intended to benefit, namely, workers. See *Ricigliano* v. *Ideal Forging Corp.*, supra, 280 Conn. 743.

The history of the statute has been reviewed elsewhere and need not be recited in detail here. See *Jones* v. *Mansfield Training School*, 220 Conn. 721, 725, 601 A.2d 507 (1992). "The legislature, in its various reenactments . . . has steadfastly manifested its intention to make these benefits a generous source of compensation for its beneficiaries." Id. The statute was amended in 1991 by the legislature in reaction to a consequence of the original statute discussed by this court in *Lucarelli*. See *Johnson* v. *State*, supra, 67 Conn. App. 336 n.6. In *Lucarelli*, the plaintiff, while on guard duty, sat on a chair to fill out paperwork and was injured when the chair collapsed. *Lucarelli* v. *State*, supra, 16 Conn. App. 67. The *Lucarelli* court noted that the statute, as it stood at the time, required only that the covered employee be engaged in a covered activity, which, in that case, was the act of guarding. Id., 69–70. Because the plaintiff was on guard duty, he satisfied the statute. Id., 70. The court specifically noted that if "the legislature had wished to limit the special benefits of § 5-142 to only those situations fraught with hazard, it easily could have done so. The absence of the terms 'hazardous' or 'special' in the statute indicates that the legislature meant to omit them." Id. The legislature subsequently added both terms. See *Johnson* v. *State*, supra, 336 n.6.

This court has examined the "special hazards" requirement once previously, in *Johnson* v. *State*, supra, 67 Conn. App. 336. In *Johnson*, we affirmed the board's decision reversing the commissioner's conclusion that the plaintiff had not satisfied the requirements of § 5-142 (a). In that case, an inmate slipped and fell while

exiting from a shower. Id., 332. The inmate grabbed the plaintiff, a correction officer, in an attempt to avoid falling, to which the plaintiff reacted by grabbing onto the inmate after which both fell to the ground, the plaintiff suffering debilitating injuries. Id. The board stated that "[a]s a legal matter, it is highly significant that (a) . . . an attack did not occur, and (b) the [plaintiff] did not mistakenly believe that he or anyone else was in danger at the time of this brief incident." *Johnson* v. *State*, 04162 CRB-01-99-12 (January 25, 2001). The latter factor is a subjective one, involving the rational perception of the plaintiff at the time of the injury.

The *Johnson* court agreed with the board that "almost any employee in any business might be placed in the unexpected situation of having to break someone's fall . . . ." (Internal quotation marks omitted.) *Johnson* v. *State*, supra, 67 Conn. App. 337. The court held that the board properly overruled the commissioner because there was no competent evidence that catching hold of people who slip is an especially hazardous aspect of a prison guard's job. Id. The board and this court found it significant that no attack on the plaintiff had occurred and that the "[plaintiff] did not mistakenly believe that he was in immediate danger." In the present case, although there was no attack on the plaintiff, the plaintiff believed that there was a threat of immediate danger.

In addition to the interpretation of "special hazards" as discussed in *Johnson*, we also review the relevant authority found in the other decisions of the board, which were not subjected to judicial review. The board first addressed the provision in *Gray* v. *State*, 12 Conn. Workers' Comp. Rev. Op. 279 (1994). In that case, a patient who, because of her mental health condition, "lack[ed] the gross motor skills of a woman of her age," began to fall. Id., 280. The plaintiff in that case attempted to break the patient's fall by lifting the patient. Id. The

board stated that the plaintiff had the burden to "establish whether the injury was caused by a risk peculiar to and obviously associated with the [plaintiff's] duties. Such risks will generally arise either from the specific job duties assigned to the state employee or from the characteristics of the person(s) with whom the state employee works." Id., 282. The board upheld the award to the plaintiff because it found that preventing the fall of a person who lacked motor skills was different and more dangerous than breaking the fall of a general member of the public.

The board next addressed "special hazards" in *Bouchard* v. *Dept. of Mental Health & Addiction Services*, 04120-CRB-08-99-09 (July 28, 2000). In *Bouchard*, the plaintiff, a supervisor at the Whiting Forensic Division of Connecticut Valley Hospital in Middletown, injured his foot while playing volleyball with inmates. Id. The board denied the plaintiff's request for benefits on the ground that he did not provide sufficient facts demonstrating that his playing volleyball with inmates was any more dangerous than playing in a typical volleyball game with members of the general public. Id. The board noted that "the fact that the hospital setting as a whole was potentially dangerous did not legally transform each act of 'attending' [the inmates] into an inherently hazardous activity . . . . [T]he presence of potentially belligerent inmates on the court may have represented a latent threat, *but the [plaintiff] had to demonstrate that this threat was realized in some manner* in order to qualify for § 5-142 (a) benefits." (Emphasis added.) Id. As in the board's decision in *Johnson*, the two factors considered important, namely, the lack of an attack and the lack of a subjective rational perception that there might be an attack were cited as the rationale for the denial of § 5-142 (a) benefits.

Finally, in *Hudson* v. *Dept. of Correction*, 4582 CRB-3-02-11 (October 31, 2003), the board upheld the award

of § 5-142 (a) benefits to a correction officer who was injured while preventing a suicide attempt. In that case, the plaintiff found the inmate while the inmate was attempting to hang himself by a sheet. Id. The plaintiff went to the inmate's cell in response to a medical call for help. Id. The inmate was conscious when the plaintiff entered the cell, and the inmate resisted the plaintiff's attempt to intervene by leaning away from the plaintiff, although the inmate was not violent. Id. When the plaintiff lifted the body of the inmate to allow him to breathe while still hanging, the plaintiff injured his back. Id. Subsequently, medical personnel cut the hanging device and thwarted the suicide. Id. Because the inmate was actively resisting the intervention, as opposed to the facts of *Johnson*, the board concluded that the injury arising from the plaintiff's attempt to prevent the suicide fell within the statute. Id. We need not determine whether *Hudson* was correctly decided on the basis of prior holdings of the board or by this court in *Johnson*. We note, however, that one of the *Johnson* factors, the resistance to intervention, could have been construed by the board as equivalent to a possible attack.

In the present case, the commissioner concluded, and the board affirmed, that the injury did not arise from a special hazard inherent in the plaintiff's job. The commissioner reasoned that the danger the plaintiff faced was similar to the danger any member of the public might face when encountering a fallen individual, whether the cause of the need for assistance was a slip on ice, a fainting episode or a motor vehicle accident. The plaintiff had the burden to show that moving the inmate presented a heightened danger different from the danger inherent in his usual job of escorting a prisoner to a courtroom, and different from the dangers encountered in other situations that might be faced by any member of the public, and rationally perceived by him to present a danger.

We first note that all of the acts cited by the commissioner and the board, such as accidental falls or motor vehicle accidents, which would preclude the compensation the plaintiff seeks, are unrelated to attacks and afford no reasonable basis for a belief that an attack is imminent. When the plaintiff entered the cell, he was not yet sure of whether the inmate was attempting suicide or whether he was faking his fall and planning an attack. The plaintiff testified that the prisoner could have been a threat if "he was faking [that] he was unconscious and then came at me. I don't know. That's why it was such a quick reaction to pull him away from the door . . . ." During this "quick reaction," the plaintiff injured his back. The plaintiff's investigation of the situation might have proven to require emergency medical assistance for the inmate or might have required other action if the inmate were engaged in a ruse intended to end in harm to the plaintiff.

On the basis of decisional precedent, a special hazard inherent in the job, for the purpose of satisfying § 5-142 (a), is a heightened danger or peril that sometimes arises in performing the enumerated jobs, other than the general hazard always present in those jobs, or present in events involving the general populace. In order to distinguish general hazards as opposed to special hazards, our court and the board have characterized the hazards present in all employments or activities as not coming within the statute. See *Johnson* v. *State*, supra, 67 Conn. App. 330; *Bouchard* v. *Dept. of Mental Health & Addiction Services*, supra, 04120-CRB-08-99-09.

In his job as a marshal, the plaintiff, whose duty it was to escort the prisoner to a courtroom, was performing that duty when he was confronted with a unique or special situation not usually encountered in that job, a situation that could not be immediately diffused without further investigation. We conclude that he was

injured as a direct result of a special hazard inherent in his duty, under circumstances that the legislature intended to make compensable pursuant to § 5-142 (a). See generally *Stuart* v. *Dept. of Correction*, supra, 221 Conn. 41.

The decision of the workers' compensation review board is reversed and the case is remanded to the board with direction to remand the case to the workers' compensation commission with direction to award benefits consistent with this opinion.

In this opinion FLYNN, C. J., concurred.

LAVINE, J., concurring. I agree that the decision of the workers' compensation review board (board) should be reversed but write separately because I conclude that injuries that are a direct of result of suicide rescue are a special hazard inherent in a judicial marshal's duties.

In this appeal, the plaintiff, Robert W. Nelson, is seeking workers' compensation benefits pursuant to General Statutes § 5-142 (a), which provides in relevant part: "If . . . any Judicial Department employee *sustains any injury* (1) . . . in the *actual performance* of such . . . *guard duties* . . . or while *attending* or restraining *an inmate* . . . or as a result of being assaulted in the performance of such person's duty, or while *responding to an emergency* . . . at a correctional institution, and (2) that is a direct result of the *special hazards inherent in such duties*, the state shall pay all necessary medical and hospital expenses . . . . If total incapacity results from such injury . . . [s]uch person shall continue to receive the full salary that such person was receiving at the time of injury . . . ." (Emphasis added.)

The findings of the workers' compensation commissioner (commissioner) are for the most part consistent

with the plaintiff's testimony and his written incident report that was placed into evidence.[1] I quote the report that was written the day after the incident. "At [approximately] 1058 hours [I] was told by Officer [Todd] Bennison to get prisoner [Larry] Ferrante and [another prisoner] ready to [go] up to courtroom 2. When I approached the cell that prisoner Ferrante was in, as always, I look through the cell door window for my safety. This is when I noticed a big puddle of blood on the cell floor. Prisoner Ferrante was standing up near the prison door when he suddenly fell to the floor. I immediately told Officer Bennison to call 911 for help. I tried to open up the cell door, but prisoner Ferrante's body was blocking the door. I was able to open the door slightly so I could fit my body in the cell and [was] able to move Ferrante so the cell door could open. After the cell door was open, I assessed Ferrante to find out where the blood was actually coming from. I then came to realize that he had sliced his wrists somehow. I promptly told the other officers to get gauze and any kind of bandages. There were no bandages to be found, so I had to improvise and use paper towels to wrap around both his arms. I then applied pressure to the worst arm and asked Officer [John] Pavia to assist me and apply pressure to the other arm. I waited for the [emergency medical technicians] to arrive at the courthouse. I then went to the hospital by ambulance with Officer [Doug] Smith to guard prisoner Ferrante up to his release from the hospital. End of report nothing follows."

I agree with the majority that the resolution of the plaintiff's appeal involves statutory construction, which is a question of law. "The principles that govern our

---

[1] The commissioner found that the plaintiff discovered the pool of blood on the floor after opening the cell door. The evidence presented at the hearing indicated that the plaintiff saw the blood on the floor while looking through the window of the cell.

standard of review in workers' compensation appeals are well established. The conclusion drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them." (Internal quotation marks omitted.) *Tracy* v. *Scherwitzky Gutter Co.*, 279 Conn. 265, 272, 901 A.2d 1176 (2006). I do not agree, however, that any deference is owed to prior decisions of the board under the facts of this case. "[T]he traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . ." (Internal quotation marks omitted.) *Ricigliano* v. *Ideal Forging Corp.*, 280 Conn. 723, 729, 912 A.2d 462 (2006). "A state agency is not entitled . . . to special deference when its determination of a question of law has not previously been subject to judicial scrutiny." (Internal quotation marks omitted.) *Tracy* v. *Scherwitzky Gutter Co.*, supra, 272.

The factual circumstances of this case, in which a judicial marshal came upon a passive prisoner in need of immediate medical attention, have not been addressed by the board. The board, in fact, conceded that *Johnson* v. *State*, 67 Conn. App. 330, 786 A.2d 1260 (2001), cert. granted, 259 Conn. 924, 792 A.2d 854 (2002) (appeal withdrawn March 28, 2002),[2] and *Hudson* v.

---

[2] In *Johnson* v. *State*, supra, 67 Conn. App. 330, this court upheld the decision of the board, concluding that reaching for an inmate who slips as he exits a shower is not a special hazard inherent in a prison guard's duties. Id., 337. The board observed that "almost any employee in any business might be placed in the unexpected situation of having to break someone's fall . . . ." (Internal quotation marks omitted.) Id. As I conclude herein, rescuing a person from attempted suicide is not a position in which almost any employee in any business might be found. In coming to this conclusion, I do not imply that any person coming upon an individual who has attempted suicide, whether in the workplace or not, would not call for medical assistance.

*Dept. of Correction,* 4582 CRB-3-02-11 (October 31, 2003),[3] are distinguishable from the facts here but nonetheless deferred to the commissioner's findings.

In this case, the parties agree that the plaintiff sustained a compensable injury, and the defendant has paid all of the plaintiff's medical expenses, *including* those for blood tests necessitated by the plaintiff's exposure to the prisoner's blood. The plaintiff, however, was totally incapacitated for three weeks due to an injury to his back that he sustained when he moved the prisoner. The issue, as stated by the commissioner, is "whether [the plaintiff] is entitled to a compensation rate of roughly two-thirds of his pay [under chapter 568 of the General Statutes] or 100 percent of his pay [pursuant to § 5-142 (a)]." To resolve the issue, this court must answer the question whether an injury sustained by a judicial marshal while he attends a prisoner who has attempted suicide is a direct result of the special hazards of such duty. I answer this question in the affirmative, concluding that because attempted suicide is an emergency that occurs in jails more frequently than it does in the general population, injuries that are a direct result of suicide rescue are a special hazard inherent in the duties of a judicial marshal.

"Relevant legislation and precedent guide the process of statutory interpretation. [General Statutes § 1-2z]

---

[3] The commissioner awarded compensation under § 5-142 (a) for an injury that resulted from an attempted suicide in *Hudson* v. *Dept. of Correction,* supra, 4582 CRB-3-02-11. The board affirmed the commissioner's finding because it concluded that the correction officer was injured while restraining a resistant inmate who was attempting to hang himself. In affirming the award, the board acknowledged the increased risk of suicide in a prison setting. "[T]he act of restraining an inmate so as to prevent his suicide falls within the ambit of special hazards of employment as a correction officer. Also, the prison setting is much more likely to produce a situation such as the one in the instant matter than other employment situations as contemplated by [*Johnson* v. *State,* supra, 67 Conn. App. 330]." *Hudson* v. *Dept. of Correction,* supra, 4582 CRB-3-02-11.

provides that, [t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the statute shall not be considered. . . . [P]ursuant to § 1-2z, [the court is] to go through the following initial steps: first, consider the language of the statute at issue, including its relationship to other statutes, as applied to the facts of the case; second, if after the completion of step one, [the court] conclude[s] that, as so applied, there is but one likely or plausible meaning of the statutory language, [the court] stop[s] there; but third, if after the completion of step one, [the court] conclude[s] that, as applied to the facts of the case, there is more than one likely or plausible meaning of the statute, [the court] may consult other sources, beyond the statutory language to ascertain the meaning of the statute." (Internal quotation marks omitted.) *State* v. *Prazeres*, 97 Conn. App. 591, 594–95, 905 A.2d 719 (2006). I conclude that the language "special hazards inherent in such duties" is ambiguous in view of the cases previously distinguished in this concurrence. I therefore look to other sources to ascertain the meaning of special hazards.

In a 1958 opinion issued by the attorney general, the stated purpose of the predecessor to § 5-142 (a) was "to give extra compensation than that provided by the provisions of the [Workers'] Compensation Act to those employees whose duties relating to the attending or restraining of inmates, and the danger of being assaulted, are more hazardous than other State employees." Opinions, Conn. Atty. Gen. No. 30-115 (January 28, 1958). The attorney general's opinion helps to make clear that an assault or physical aggression toward a

state employee is not a necessary component of a compensable injury under the statute. The question then becomes whether any type of resistance on the part of the prisoner who attempts suicide is necessary to constitute an inherent special hazard, as suggested in *Hudson* v. *Dept. of Correction*, supra, 4582 CRB-3-02-11. I think it is not.

Although decisions of this court and our Supreme Court recognize that the duties of certain state employees subject them to assault; see, e.g., *Jones* v. *Mansfield Training School*, 220 Conn. 721, 724, 601 A.2d 507 (1992) (employee injured when attacked by resident of training school); under the statute, physical violence or aggression is not the only danger for which compensation is available. The present form of the statute also contemplates that a judicial marshal may be required to respond to an emergency. The statute now provides that certain state employees who interact with prisoners may be subject to injury by means other than physical violence. By the clear language of the statute, therefore, benefits are available under § 5-142 (a) not only for an injury sustained by a marshal who was restraining a prisoner or who was assaulted by one, but also for injury sustained while the judicial marshal was "responding to an emergency . . . ." General Statutes § 5-142 (a). In this case, a judicial marshal was exposed not only to the prisoner's blood and the possible risk of contracting a deadly disease, but also to an injury to his back caused by having to move the prisoner in order for emergency medical treatment to be provided.

Suicide, or attempted suicide, is not uncommon in prisons and jails. Trial courts routinely place prisoners who are accused of crimes on suicide watch. Counsel for the parties here debated prisoner suicides before the commissioner, who acknowledged at the hearing

that suicide could be considered a special hazard,[4] but made no such finding. Moreover, the literature indicates that suicide in jails is disproportionately higher than in the general population. "While suicide is recognized as a critical problem within the jail environment, the issue of prison suicide has not received comparable attention. Until recently, it has been assumed that suicide, although a problem for jail inmates as they face the initial crisis of incarceration, is not a significant problem for inmates who advance to prison to serve out their sentences. The assumption, however, has not been supported in the literature. Although the rate of suicide in prisons is far lower than in jails, it remains disproportionately higher than in the general population." M. Thigpen, Foreword, Prison Suicide: An Overview and Guide to Prevention (United States Department of Justice, National Institute of Corrections 1995) p. ii. The board itself, in fact, has recognized the higher frequency of attempted suicide among prisoners. See *Hudson* v. *Dept. of Correction*, supra, 4582 CRB-3-02-11.

---

[4] The following colloquy occurred during the hearing.

"[The Plaintiff's Counsel]: . . . *Johnson*, the earlier case, is where an inmate trips and falls and they say, hey, that can happen anywhere. They indicate, we think, [that] there is a difference between these two activities, that is the *Johnson* [plaintiff] falling accidentally and that of restraining an inmate to prevent a suicide . . . . Prevent the suicide falls in the special hazards of employment as a correction officer.

"The Commissioner: Well, we just want to illuminate a bit about these cases, and a suicide situation is probably not unique because people do that more than just in jails, but what it would seem to me, it could be considered a special hazard and, therefore, things would befall a particular inmate or one of the employees. I could see how that in effect is a special hazard. I don't think it is unique, but it is special.

\* \* \*

"[The Plaintiff's Counsel]: And that—not that, I think not that it could only happen there, but that it is more—the chances are more likely that it is going to happen there.

"The Commissioner: That is what I think we understand when we talk about a special hazard in this context; that it is something that will happen here far more readily than anywhere else."

I disagree with the commissioner's reasoning that, when the plaintiff discovered the bleeding prisoner, he responded as any member of the general public would have responded. In doing so, the commissioner relied on *Johnson* v. *State*, supra, 67 Conn. App. 330, in which the plaintiff prison guard sustained an injury while supporting an inmate who had slipped on the floor while exiting a shower. In *Johnson*, this court agreed that when one sees a person trip or fall, the natural reaction is to come to the person's aid. In today's world, when deadly diseases can be transmitted by means of blood products, a member of the general public is not likely to render physical aid to a person who is bleeding because he slit his wrists. Indeed, when explaining to the commissioner that the state would pay for the plaintiff's blood tests, counsel for the defendant, the state of Connecticut, conceded the danger when he stated: "Your Honor, the state will concede . . . given the circumstances regarding the injury . . . that bill should be paid for . . . ."

I also disagree with the manner in which the board distinguished the facts here from *Hudson*, to wit: the plaintiff in this case "was moving the inmate after the suicide attempt. The [plaintiff] was not preventing or stopping the suicide, nor was he restraining the prisoner." In *Hudson*, the prison guard came upon the inmate as he was dangling in a noose and sustained a back injury by lifting the inmate to prevent strangulation. In this case, the plaintiff came upon the prisoner immediately after he had collapsed on the floor and was bleeding profusely. Although the plaintiff did not prevent the suicide attempt in the sense that he kept the prisoner from slitting his wrists, he may have prevented the prisoner's death by moving the prisoner so that he and others could administer first aid. I believe that a suicide attempt is not over until the victim either

dies or is rescued, regardless of the means of suicide employed.

Because I conclude that injuries directly related to suicide rescue are a special hazard inherent in a judicial marshal's duties, I concur.